# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

DUPREE LANGSTON,

   Petitioner,

  v.

STU SHERMAN,

   Respondent.

Case No. 1:17-cv-01108-DAD-SAB-HC

FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On February 15, 2013, Petitioner was convicted after a jury trial in the Kern County Superior Court of seven counts of robbery, attempted robbery, assault with a semiautomatic firearm, conspiracy to commit robbery, and participation in a criminal street gang. (17 CT[1] 4601–51). The trial court sentenced Petitioner to an imprisonment term of seventy-eight years and eight months. (18 CT 4933). On May 17, 2016, the California Court of Appeal, Fifth Appellate District struck the section 12022.53 enhancement on count 13 and ordered the trial court to amend the abstract of judgment to correct clerical errors. With the modifications, the

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on February 28, 2018. (ECF No. 12).

judgment was affirmed. People v. Langston, No. F067421, 2016 WL 2963353, at *37 (Cal. Ct. App. May 17, 2016). The California Supreme Court denied Petitioner's petition for review on August 17, 2016. (LDs[2] 8, 9).

On August 17, 2017, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). In the petition, Petitioner raises the following claims for relief: (1) the trial court's erroneous failure to bifurcate; (2) improper admission of expert testimony; and (3) improper eyewitness identification procedures. Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 11, 16).

## II.

## STATEMENT OF FACTS[3]

### *The crimes*

Among the crimes reported in Bakersfield, Delano, and Visalia in September, October, and November 2011 were the armed robberies (only attempted in one instance) of the following eight stores: (1) Gold Buyers, Bakersfield (Sept. 30, 2011); (2) Dollars for Gold, Bakersfield (Oct. 6, 2011); (3) Advance America Cash Advance, Delano (Oct. 11, 2011); (4) Gold Rush Jewelers, Bakersfield (Oct. 22, 2011); (5) AutoZone, Bakersfield (Oct. 23, 2011); (6) Check into Cash, Visalia (Oct. 26, 2011); (7) Max Muscle, Bakersfield (Oct. 30, 2011); and (8) Allied Cash Advance, Delano (Nov. 2, 2011). Victim witnesses viewed photo lineups and identified Lawton, Langston, or both as participants in the crimes.

. . .

### *The evidence at trial*

#### *Gold Buyers, Bakersfield, September 30, 2011*

Jacqueline Carrillo, 19 years old, testified that she was the manager of Gold Buyers at 4040 Ming Avenue in Bakersfield, a business that paid customers cash for gold jewelry. Around 2:00 in the afternoon on September 30, 2011, Carrillo was the only employee in the store. An African-American man, about six feet tall, appeared at the glass door and rang the doorbell. Carrillo buzzed him in. She testified that he was in his late 20s and wore sunglasses, a black newsboy cap, and a long-sleeve, button-down burgundy shirt. A second man, also African-American, appeared and entered with him. He was younger and shorter, about 19 or 20, around five feet two or three inches tall (thus shorter than Carrillo, who was five feet four inches tall), and around 150 pounds. The short man was wearing a

[2] "LD" refers to the documents lodged by Respondent on February 28, 2018. (ECF No. 12).
[3] The Court relies on the California Court of Appeal's May 17, 2016 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

dark plaid, short-sleeve, button-down shirt with jean shorts.[4] He was also wearing a black baseball cap with a sports team logo.

The short man was holding a black handgun. He jumped over the counter and knocked Carrillo down. He pinned her to the floor on her stomach, held her by the hair and put the gun to her head. He said, "Tell me where the money is, bitch? I'm going to fucking kill you." As he looked for money, he dragged her along the floor by her hair. The tall man stood behind the counter, telling the short man where to look for money. Then the short man grabbed Carrillo's arm and told her to get up. The robbers demanded to know where the safe was and said they would shoot her if she did not show them. She showed them the safe and opened it. It contained about $10,000 and some gold items. The short man took this property.

During the robbery, the tall man gave orders to the short man. The tall robber's voice was neutral, but the short one spoke loudly and was the more nervous of the two. After they took the money, they told Carrillo to buzz them out. The tall man was holding Carrillo's purse and the short one had taken her cell phone. Carrillo said she would not buzz them out unless they gave her things back to her. After taking the battery out of the phone, they complied and she buzzed them out.

Carrillo and Sergeant Brent Stratton testified about photo lineups Carrillo viewed on October 4, 2011. While investigating a suspect ultimately not charged in the case, Stratton created a photo lineup not including Lawton or Langston. Carrillo made no selection. Carrillo and Detective James Dossey testified that Dossey showed Carrillo two photo lineups on November 8, 2011. One included Langston and the other included Lawton. Carrillo identified Langston as the short robber. She did not select anyone in the lineup that included Lawton.

Carrillo testified that, in January 2012, she met a police officer at the courthouse and was asked to look through a window in a courtroom door. This was on the day of the preliminary hearing. Three African-American men were inside the courtroom sitting at a table. The officer asked Carrillo whether the robbers were among the men. Carrillo could not see the men well enough to identify any of them. She said they were too far away. She picked out one man, however, and said he definitely was not one of the robbers. Sergeant Stratton testified that the three men in the courtroom at that time were Lawton, Langston, and Harper. Harper was the one Carrillo singled out as not having been involved.

During trial, after Carrillo described her recollection of the robbers' appearance as "very vague," the prosecutor asked her whether anyone in the courtroom looked like the perpetrators. Carrillo said Langston looked like the short robber, based on his height and the lower part of his face. "He had the hat on which was kind of low; so I could just make out more so the bottom part of his face," she said. Carrillo then testified that Lawton looked like the other robber. She relied on height and the lower part of the face in Lawton's case as well. "Since he had a hat and glasses on, it's really hard for me to make out the eyes," she testified. When Lawton and Langston stood together, the difference in height looked the same as the difference in height between the robbers. Carrillo said she was "80 percent sure" of her identifications of each defendant.

---

[4] For reference, here are the descriptions of Lawton and Langston from their probation reports. Lawton, born September 12, 1981, was African-American, six feet one inch tall, and weighed 240 pounds. Langston, born June 27, 1993, was African-American, five feet five inches tall, and weighed 160 pounds.

On cross-examination, Carrillo said she remembered the short robber's height because he was a couple inches shorter than she was. When Carrillo and Langston stood together in the courtroom, however, Carrillo conceded that Langston was about an inch taller than she was.

Catherine Bloxham testified that she worked in an office in the same building as Gold Buyers. Carrillo came to Bloxham's office and called the police after the robbery. Bloxham recalled seeing two men enter Gold Buyers shortly before. She saw them from about 15 feet away through the glass front of her office. A few minutes later, she saw them leave. She had seen the same men at the door of Gold Buyers about three days earlier. On November 8, 2011, a detective showed Bloxham a photo lineup including Lawton and another including Langston. Bloxham selected Lawton but identified no one in the lineup including Langston. Bloxham testified that the photo she selected looked most like one of the men she saw, but she was not certain. When asked if she could identify the defendants at trial, she said she "couldn't make a positive identification." Like Lawton and Langston, the robbers were a taller, huskier man and a shorter, more slender one, and their skin tones were similar to those of the robbers. Bloxham could not testify to any additional similarities.

A surveillance video showing parts of the robbery was played for the jury and some still photos taken from the video were presented. The images do not clearly show the robbers' faces, but their heights, builds, and clothing can be seen. The clothing is as Carrillo described, and one robber is taller and stockier than the other. The tall robber's cap has a white logo on the back. The right back pocket of the short robber's shorts has a white fleur-de-lis design.

Detective James Dossey testified that he had had multiple contacts with Lawton over the years. Dossey had studied the surveillance video and still photos from the Gold Buyers robbery and opined that the tall robber was Lawton.

An evidence technician testified that he extracted a one-to-two-second portion of the surveillance video in which the tall robber grasps a black case in his hand. The technician made a loop of this portion, so the grasping motion is shown repeatedly. In this video, the end of the tall robbers' right index finger can be seen to be missing, cut off between the second and third knuckles. Breon Mosley, an acquaintance of defendants', testified that Lawton had a missing right index finger.

Lawton and Langston were pulled over and arrested while driving a white minivan on November 3, 2011. A police officer testified that the van contained various items of clothing, including a pair of denim shorts. The shorts had a white fleur-de-lis emblem on the right back pocket. The shorts and a photograph of the shorts were shown to the jury. Carrillo testified that the logo on the shorts found in the van was the same as the logo on the shorts worn by one of the robbers.

On the day of the arrest, the police searched the home of Jamiya Chandler, known as Red, a girlfriend of Lawton's. An officer testified that among the items found was a dark blue hat. The hat had a white Kangol logo on the back and the officer described it as a golf hat. The hat and photographs of it were shown to the jury. It resembled the hat seen on the tall robber in the video. Carrillo recognized the logo as matching the one on the robber's hat, and said the hat looked similar, but she was not sure it was the same one. Some letters from Lawton and a bail bond document bearing Lawton's name also were found in Chandler's home.

Jason Furnish, an investigator with the district attorney's office, testified that he analyzed data provided by cell phone companies for several accounts, including Lawton's. Furnish used the data to determine the location of Lawton's phone at the time of the robbery. He concluded that Lawton's phone was near 4040 Ming Avenue at 2:08 p.m. that day. It traveled toward that area before the robbery and away from it afterward.

Officer Brian Holcombe testified as the prosecution's gang expert. (His testimony will be discussed in more detail below.) He said Lawton and Langston had both admitted to being members of the West Side Crips criminal street gang. Lawton went by the monikers Chocolate City, Choc, and Dark C. Langston was called Tiny E–Loc. Several other people whose names will be mentioned in this opinion also were members or associates of the West Side Crips, according to Holcombe: Maurice Spellman, known as Eclipse, who was Lawton's brother; Deontre Miller, called Brains; Antwyne Harper, known as Unc or Unk; and Randon McQuiller.

During a period of about two weeks before the robbery, Lawton communicated by text message with some of these fellow Crips, discussing guns, robberies, and a need for money. Sergeant Stratton testified about data taken from defendants' cell phones. On September 15, 2011, Lawton sent someone a message saying he was out of jail on bail. On September 19, 2011, he sent a message to "Randon": "Baby got ninez for sell in landcaster" at a price of "80 in da box."[5] Stratton said this referred to nine-millimeter semiautomatics. Later that day, Lawton texted Brains that he was on the road to Lancaster "to get this burnerz." Burners means guns. On September 23, 2011, Lawton exchanged texts with Brains, including this one from Lawton: "Let knocc of lucky 7 on white lane by da old walmart they got it." Stratton said "knock off" means rob, and Crips often replace "ck" with "cc" in writing because "ck" stands for Crip killer. On September 25, 2011, Lawton sent a message to an unknown subscriber: "I got an inside on a checc cashing spot out here no bullshit." The recipient answered: "Let me know how it can go down." Lawton replied: "Just have every thing ready in da morning." Holcombe opined that this meant Lawton had information about a business, and he and his correspondent were planning to rob it.

On September 27, 2011, Lawton received a text from Unc: "What the lick read." A "lick" is a robbery. The next day, Unc texted Lawton: "oswell by the wall is where we hit, our spot." Lawton replied "Nigga west cost cash." Unc wrote back: "Check into cash." About two hours before the robbery on September 30, 2011, Lawton wrote to Mosley: "Tell tiny e loc to call me asap."

The day before the robbery, Lawton texted someone about his financial problems. "I'm good thank you! What about you? ?" wrote his correspondent. "Not so good," answered Lawton. "Why what's going on? ?" was the reply. Lawton wrote, "Need some bread got da stuff got to pay for a bacc dated on." The correspondent apparently tried to help Lawton but could not, writing a few hours later: "My card is blocked or something wont let me pull the money off of it." Lawton wrote, "Okay thankz for tryin." Over the previous few days, Lawton had had text exchanges with Chandler and an unknown correspondent about drug deals that failed to be completed and a check that could not be cashed. Lawton asked McQuiller if he could borrow a hundred dollars, but McQuiller said he did not have it. A few hours after the robbery, however, Lawton's financial position

---

[5] The text messages quoted in this opinion are all written in highly colloquial language. Alternations, indicated in brackets, have been made only when necessary to aid the reader.

seemed to have improved. Chandler texted, "We owe tt 300 for your bail." Lawton replied, "U told me love i got her tell her to breef eazy."

### *Dollars for Gold, Bakersfield, October 6, 2011*

Cecelia Lepore and Edson Seijas testified about the robbery at Dollars for Gold at 4028 Niles Street in Bakersfield. Lepore, who was 21, was the only employee working at the store on October 6, 2011. Dollars for Gold bought gold and silver items from customers. Seijas, Lepore's husband, was with her in the store. In the afternoon, two African-American men entered the store. Lepore testified that one man was about five feet six or seven inches tall, slim, and about 20 to 25 years old. He was wearing dark jeans and a black, white, and brown sweater with an argyle pattern. The jeans had a large light-colored cross emblem on the back pocket. He also wore a dark baseball cap with a light-colored logo on the front. Lepore said the second man was taller, five feet eight or nine inches, and was wearing sunglasses and a black hooded sweatshirt with the hood up. Both robbers were wearing white latex gloves.

When the robbers entered, the short robber pointed a black semiautomatic pistol at Lepore, ran behind the desk where she was sitting and pulled her onto the floor. He grasped her by the hair and pulled her head between his knees. He said, "[G]ive me the fucking money." A clump of her hair was pulled out. The tall robber told Seijas to get on the floor. After Lepore directed the short robber to the money, he said he knew there was more and he would kill her if she did not produce it. The robbers took about $4,000 in cash and about $1,500 worth of gold, according to the store's owner. They also took Lepore's wallet and keys. She called the police as soon as the robbers left. The 911 call was received at 3:11 p.m.

The jury was shown two surveillance videos of the robbery and still photos taken from the videos. Again, the height, build, and clothing of the robbers can be seen. Their faces are not easy to make out, although each looks directly toward the camera at certain points.

Rebecca Hooper testified that she was a passerby outside Dollars for Gold at around 3:00 p.m. on the day of the robbery. Seijas saw her through the window and asked her to call the police. She saw two men running away, one holding a gun. She did not get a good look at their faces and said she would not be able to identify them, although she thought one looked younger than the other. One was taller than the other, but not by "a whole lot." Both were between five feet six inches and six feet tall.

Shortly after the robbery, an officer drove Lepore and Seijas to a field show-up of two suspects named Hasley and Harris. Lepore and Seijas said the suspects were not the men who committed the robbery.

Deputy Sheriff Jason Balasis testified that he prepared photographic lineups to show to Lepore and Seijas. The lineups included Langston and Breon Mosley, but not Lawton. Balasis said he did not include Lawton because he did not think the tall robber in the videos looked like Lawton. On November 15, 2011, Lepore and Seijas each selected a picture of Langston as showing the short robber. They did not select Mosley.

Lepore identified Langston in the courtroom during trial as the robber who held the gun, but testified, "I'm not 100 percent." Seijas testified that, seeing Langston

in person, he thought he looked like the person he selected in the photo lineup. When asked whether Langston looked similar to the robber who had the gun, Seijas said, "About 30 percent."

When he was arrested, Langston was wearing jeans with emblems on the back pockets described by a police officer at trial as gold crosses or fleurs-de-lis. The jeans were shown to the jury, but the appellate record contains no photographs of them from the back side. The clothing items found in the white minivan at the time of the arrest included a black, white, and brown argyle sweater. It looked like the sweater seen on the short robber in the surveillance video. In the pocket of another pair of jeans found in the van was a pair of white latex gloves. The items or photos of them were displayed to the jury.

Furnish, the district attorney's investigator, testified that cell phone records showed Lawton's phone making calls in an area some distance to the west of Dollars for Gold between 11:58 a.m. and 2:28 p.m. on the day of the robbery. Close to the time of the robbery, around 3:00 p.m., Lawton's phone moved into the area covered by the tower closest to the store. Later that afternoon, Lawton's phone had moved back to an area to the west of the store.

Sergeant Stratton testified about text messages included in defendants' cell phone data. In the morning on the day of the robbery, Langston's phone sent a message to Mosley stating: "[Hey] cuz let cuz know what's the time he [got to] be ready cuz niggas got to handle shit."

### *Advance America Cash Advance, Delano, October 11, 2011*

Adriana Gutierrez, 20 years old, testified that she was the only employee working at Advance America Cash Advance at 1019 Main Street in Delano on October 11, 2011. Advance America Cash Advance was a business that made payday loans to customers. At 3:10 p.m., two African-American men entered. She estimated one was between five feet eight inches and six feet one inch tall and weighed about 230 pounds. He wore a hat, a white shirt, and a black tie. The other man was about five feet five or six inches tall and weighed about 120 pounds. He wore a hat, a turquoise striped shirt, and black pants. A surveillance video and still photos from the video were shown to the jury. These show the robbers' clothing, size, and body types but do not include clear images of their faces. The short robber's shirt was a plaid in black, white, and turquoise.

When the two men entered, the short one approached the counter as the tall one walked to the back of the store. The short robber then leaped over the counter, knocked Gutierrez to the floor, and put a gun to her head. He held her down on the ground, demanded to know where the money was, ordered her to open the cash drawer, called her "bitch" repeatedly, and threatened to kill her. The tall robber ordered her to direct him to the safe, which was unlocked. Then, still pointing the gun at her, the short robber ordered Gutierrez to lock herself in the bathroom. About $2,000 was stolen.

Gutierrez and Detective Heriberto Trigo testified about photo lineups Trigo showed to Gutierrez. On October 12, 2011, the day after the robbery, Trigo showed Gutierrez a lineup that did not include defendants. She did not select any of the pictures. On November 10, 2011, Trigo showed Gutierrez two more lineups, with Langston in one and Lawton in the other. Gutierrez identified Lawton and, after first marking a different photo, also identified Langston.

Gutierrez testified that she recognized the picture of Langston partly because his left eye was slightly lower than his right.

On January 10, 2012, the day of the preliminary hearing, Gutierrez came to the courthouse under subpoena and was asked to sit in the courtroom and observe about 10 inmates who were present there. Lawton and Langston were among them. Gutierrez recognized them as the robbers. She also identified defendants as the robbers in the courtroom at trial, saying yes when asked whether she could do so "with certainty."

One of the items found in the minivan when defendants were arrested was a turquoise, black, and white plaid shirt matching the one seen in the surveillance video. The shirt and pictures of it were shown to the jury.

Detective Trigo testified that he used swabs to collect possible DNA traces from surfaces the robbers touched, including the front counter, on which the short robber placed his hands when vaulting over. A profile for the major contributor to the DNA found on the swab of the front counter matched Langston's DNA profile. The chances of a coincidental match with that profile were one in 553 million for African-Americans, one in 731 million for Caucasians, and one in 208 million for Hispanics.

Furnish testified that cell phone records for Lawton's phone showed the phone using towers in Bakersfield until around 2:30 p.m. on the day of the robbery, at which time it began using towers north of the city, covering State Route 99. From 2:54 p.m. to 3:13 p.m., the phone used a tower in Delano (which has only one or two towers), and specifically the side of the tower that covered 1009 Main Street. Later that afternoon, Lawton's phone again used towers in Bakersfield. Records for a phone belonging to Red (Jamiya Chandler, Lawton's sometime girlfriend) showed a similar pattern that day.

Sergeant Stratton testified about the records of text messages on defendants' phones. On October 12, 2011, the day after the robbery, Lawton received a message from a James Taylor or Taylor James. It included the words, "[Hey] i mite hav a licc." "Lick" is slang for robbery, as mentioned above.

On October 19, 2011, about a week after the robbery, Langston had an exchange of text messages with his sister Krishell. Krishell remarked that her car was not working. Langston answered that mobility was saving him from being caught, although he also was having car trouble: "Yea that the best thing going for me stay moving they always try to catch me but I leave they ass way behind. an to add on my car tripin to." Krishell asked, "Catch u for what?" Langston replied: "Nothing sis what kinda car you got an it's some things I really want to talk to you about but it's hard an I don't [want] you to look at me the wrong way." Krishell: "Just tell me." Langston: "Im on the run for what let's just say being from the mob real talk sis like im really the man for my age that why im in so deep." Krishell was surprised and worried: "The mob? As in street mob? Or Italian mob? [¶] Dupree please think about what u do and please be safe!!" Langston regretted his candor: "See that why I did not want to [talk] about that life with you cuz every thing I tell you go be shock an like wow."

### *Gold Rush Jewelers, Bakersfield, October 22, 2011*

Michelle Castellanos, who was 25, testified that she was at work at Gold Rush Jewelers at the corner of Brundage and H Streets in Bakersfield around 4:00 p.m.

on October 22, 2011. Also present in the store were Castellanos's 14-year-old sister J. and Christopher, a teenager who had been hired to stand on the street corner holding a sign advertising the business. The business bought and sold jewelry, musical instruments, and other items.

An African-American man entered the store and approached the counter. He was about six feet tall, with a medium build, in his late 20's or early 30's, and wearing baggy clothes, a baseball cap, and sunglasses. He had some earrings in one hand and some cash in the other. He gave the earrings to Castellanos as if intending to sell them. As she took the earrings, a second African-American man entered the store. He was about five feet five inches tall, thin, no older than 20, and also wearing baggy clothes, a baseball cap, and sunglasses. Before Castellanos could get started inspecting the earrings, she saw Christopher, who had been standing close to the short man, go down on all fours. Then she saw that the short man had a black semiautomatic pistol in one hand. He put the other hand on the counter and leaped over. Once over the counter, the short robber approached J., grabbed her by her hair, and put the gun to her head. Castellanos immediately ran to the silent alarm lever and pulled it. The lever sent a signal to an alarm company. The taller robber said "let's go," and the short one jumped back over the counter. The two men ran out the door and then walked quickly away from the building. Without pausing to reflect, Castellanos chased them out the door. She ran halfway across the parking lot before turning back and going back inside to call the police.

On or after October 30, 2011, before Castellanos saw any photographic lineups, she saw a news story on the internet about the Max Muscle robbery discussed below. The story included surveillance video and named defendants as suspects. Castellanos thought the robbers in the video could be the same who robbed her. She searched Facebook for them by name and found Lawton's Facebook page. The page included dozens of photos of Lawton. Castellanos was convinced he was the tall man who participated in the robbery of her store. She contacted the police with this information.

On November 8, 2011, Detective Dossey showed Castellanos photo lineups that included Lawton and Langston. She selected a picture of Lawton and said he was the tall robber, but for the short robber she selected a picture that was not of Langston.

Castellanos came to court under subpoena on January 10, 2012, the day of the preliminary hearing. Sergeant Stratton asked her to look through the window in the courtroom door, observe the inmates inside, and say whether she saw the men who robbed her. The group of inmates in the courtroom that day consisted of four or five African-American men, six Hispanic men, and one white man. Castellanos identified Langston as the short robber. Lawton was not present. At trial, however, Castellanos testified that she recalled identifying both robbers at the preliminary hearing.

At trial, Castellanos identified Lawton and Langston as the robbers. She said she had no doubt.

Jacqueline Arnold entered the store just after the robbery attempt. Around 4:00 p.m. on the day of the attempted robbery, she drove up to a cigarette store in the same shopping center as Gold Rush Jewelers, planning to buy cigarettes. She testified that, before she could enter the cigarette store, she saw two African-American men come out, one about six feet tall and the other about five feet two inches tall. The short man was putting his hand under his shirt by his waistband.

Arnold believed she had a good view of the short man, but not of the tall man. The short man had a distinctive nose. She watched them walk rapidly across the parking lot.

Sergeant Stratton showed photographic lineups to Arnold on November 14, 2011. She selected photos of Langston and Lawton. She felt very certain of her identification of Langston and less certain about Lawton.

Arnold came to the courthouse under subpoena on the day of the preliminary hearing and was asked by Stratton to look through the courtroom window at the inmates inside. This was the same group of inmates Castellanos had observed. Lawton was not present and Arnold identified Langston but, like Castellanos, she testified at trial that she saw both robbers though the window that day. Arnold also identified defendants as the robbers at trial, but said she only "[s]ort of" recognized Lawton.

The jury was shown a surveillance video and still photos taken from the video showing the parking lot in front of the store. The video shows the robbers entering and leaving the store. They are far from the camera and their images are indistinct. The video shows a black car parked in a far corner of the parking lot. Moments after defendants are seen walking out of the parking lot, the black car backs out of its parking spot and drives away. Stratton testified that the car in the video could be a Chrysler 300M, though he could not say for sure. Antwyne Harper owned a black Chrysler 300M.

The cell phone data showed that Lawton and Harper exchanged text messages the day before the robbery. Harper wrote, "Hit me when u get up n let me know what we doing [¶] Listen we can get a rental w this last change but its for a bill but we can do what we do, speak 2 me." Lawton replied, "She alredy trippin on da last one." Harper returned, "So we just don't go front street n the black thing [¶] Or we get my Lo key but its not for front but we can slide [¶] In it." Stratton testified that going front street meant being obvious or easily seen.

On the morning of the robbery, around 7:00 a.m., Lawton and Harper exchanged texts in which they complained about having to wait for something to open and then argued over the question of delaying their action. Harper wrote, "What's up." Lawton texted, "Shit slow motion." Harper replied, "I can't live like this let's just hit it in my shit n go from there." Lawton misunderstood, thinking Harper meant they should proceed immediately: "Hit what shit still close." Harper became annoyed: "That's not what I said, I said hit it, which means ride off, now u understand n stop w the negative its 2 early 4 that, I'm all n w u however we can b there but if [¶] u feel like we stopping or holding u back, i want 2 eat n need 2 more than u know but I'm not going to book out or let I or tiny do so if [I can] help it, so if [that] [¶] is wrong oh fucking well [¶] I'm not going 2 let u or shorty gook out if I or we can help itn if u get hot bout that Fuck u but I refuse 2 loose u or shorty if I can c it b4 it happen or u/ [¶] we moving wrong [¶] Am I wrong 4 that." Lawton was conciliatory: "Naw nigga we [good]." The conversation continued about two hours later. Lawton wrote, "Come too my bro spot asap bring da white car [¶] ... [¶] U dnt even [know what's] up." Harper replied, "U told me 2 come, so what's up." Lawton rebuked him for his earlier complaints: "Unc dnt trip well get it done [¶] ... [¶] U say we moving wrong n dnt knw what da movement is nigga ask u too come this way n u shot me some bullshit about movin wrong."

At 12:16 p.m. that day, a few hours before the robbery, Lawton texted Langston: "Whatz good." Langston answered, "Shit im with unc we grabin the car."

About two hours later, at 2:06 p.m., Lawton texted Langston: "Come on loc." Langston relayed the word to Harper: "Meet us at choc house." Harper confirmed: "K." At 2:37 p.m., Lawton texted Harper: "We gonna have too meet by da [car] give her [this] one n jump in da car wit u."

Forty minutes before the robbery, at 3:20 p.m., Langston received a text from his girlfriend, identified in his contacts as Doness Ladii Loc, asking him to come over: "Lowkey loneLy here <3." Langston explained that he was busy: "Im doin a job right now ma you know to get that bread." She urged him to be safe and said she would be there when he got back. She wrote that she had gotten dressed up for him: "u knw im sprung & in love witt ganGsta! gotta look Good fo [him]!" "Doness" is an affectionate name for a gang member's girlfriend, a female equivalent of "don," according to Holcombe.

The data on cell phone tower usage showed that Langston's and Lawton's phones used towers near Gold Rush Jewelers around 4:00 p.m. on the day of the robbery. That evening after the robbery, defendants' phones used towers farther away from Gold Rush Jewelers. Tower usage records for phones belonging to Harper and his wife, Marion Harper, showed a similar pattern.

### *AutoZone, Bakersfield, October 23, 2011*

Eduardo Martinez, Manuel Hernandez, and Pedro Cortez testified that they were working at the AutoZone auto parts store at 3324 Niles Street in Bakersfield around 9:30 p.m. on October 23, 2011. Martinez, the manager, was in the office at the back of the store with Cortez counting money to put in the safe. Martinez turned around and suddenly a chrome nine-millimeter semiautomatic pistol was pointed at his head. The man holding it had a black and red baseball cap pulled down low on his forehead and a red bandanna covering his face from the eyes down. He wore a red shirt with a white thermal shirt underneath. He was six feet one or two inches tall and African-American. The robber ordered Cortez to get on the floor and told Martinez to open the safe or he would be shot. Martinez opened the safe and then was also ordered to lie on the floor.

Meanwhile, Hernandez was mopping the restrooms. Someone came from behind and tried to grab him. Hernandez turned and saw a man pointing a black semiautomatic pistol at him. The man was about five feet seven inches tall, African-American, dressed all in black, and wearing a black ski mask. When the man tried to grab Hernandez, Hernandez's glasses fell off. Hernandez was nearsighted. After forcing Hernandez to the ground, the man ordered Hernandez to get up and take him to the safe.

Back in the office, the tall robber took money from the safe, but there was more money in an inner compartment to which Martinez did not have the key. The tall robber repeatedly threatened to kill Martinez if he did not open the compartment. At this point, the short robber entered with Hernandez and ordered him to the ground. The short robber was more nervous and aggressive than the tall robber and said he would kill them all. Martinez said, "[P]lease don't do this, I have kids."

The robbers next ordered Martinez to go to the cash registers and open them. In his nervousness, Martinez was unable to get them open. One of the robbers said

that if Martinez did not open the registers, the robber would kill the other two employees. Martinez still could not do it, however, and after a while, the robbers gave up and walked out. About $2,000 was taken. Hernandez's cell phone and Cortez's wallet also were taken.

Martinez saw pictures of Lawton and Langston on the television news after they became suspects in the Muscle Max robbery. He was convinced they must be the men who robbed his store as well. He and the other two AutoZone employees could not identify defendants as the robbers, however.

The jury was shown surveillance video taken from several different places in the store, along with some still photographs taken from the video. The images are grainy and indistinct, but the robbers' clothing and relative sizes can be seen. Grayish gloves can be seen on the tall robber.

In the white van in which defendants were arrested, officers found a red ski mask. Hernandez testified, however, that it did not look like the one worn by the short robber; he was sure the one used in the robbery was a darker color. Latex gloves were found in the van, as mentioned above, as was a black nine-millimeter semiautomatic pistol.

Lawton sent Langston an affectionate text at 12:35 p.m. on October 23, 2011, to start planning the AutoZone robbery. "What good love one," he wrote. Langston was ready to get started: "Shit you at home niggas [ain't] makin no moves." Lawton told him the plan: "We need too more people to hit auto zone on niles at first dark so u tell me whats up no dressin up [straight] goon shit." Stratton explained that the last part meant they should wear plain criminals' clothes, not anything ostentatious. Langston confirmed the location: "On niles." Lawton answered, "Yep." He went on, "Cuz it four workerz n one manager wit da key to everything we need." Langston asked whom else they should recruit, besides Harper: "So how much you think in there you unc babydizzeo or brains." Lawton answered: "brainz." Langston: "True lets make it happen baby." Lawton: "All da tyme all r nuthin." Langston wanted to begin before Harper wandered off: "So who weh waiten on unc cuz might [start] catin off with his little wip." Stratton said a "whip" is a car. Lawton replied that they would not act until evening: "Naw loc we waitin on 730[or] 8." At 3:47 p.m., Langston checked in with Lawton: "Nigga where you at." Lawton answered, "By da fair ground y whatz hood." Langston expressed some anxiety about the job: "Nigga this shit betta be candy we goin so late." After the robbery, at 10:42 p.m., Langston texted Lawton: "What happen where you at we got a thousand only five five give unc two."

Cell tower data showed that Lawton's phone was at or near AutoZone at 9:39 p.m. and 9:42 p.m. and moved away afterward. From 9:35 p.m. to 9:39 p.m., Harper's phone used a tower and sector serving the location of AutoZone. Afterward it moved away. About half an hour before the crime, Langston's phone was using the same tower and sector as Lawton's in an area to the west of AutoZone. The data did not show where Langston's phone was at the time of the robbery.

### Check into Cash, Visalia, October 26, 2011

Barbara Martinez testified that she was working alone at Check into Cash at Noble Avenue and Chinowth Street in Visalia around 3:45 p.m. on October 26, 2011. Check into Cash makes payday loans to customers.

Two African-American men approached the front door and one pulled on the handle. Martinez buzzed them in. One man was thin and about five feet five or six inches tall. He was carrying a black messenger bag and wearing a dark blue T-shirt, dark jeans, and a dark blue or black baseball cap with white stitching on the front. He looked young and had a "baby face." The other man had a stocky build and was six feet five or six inches tall. He wore a dark baseball cap and dark jeans with a brown and beige plaid button-down shirt with a dark shirt underneath. Under the baseball cap, he was wearing a wig. It was matted and frizzy and reached the middle of his back.

The tall robber asked Martinez about a payday loan. As she answered, he walked around to her side of the counter and drew a silver semiautomatic pistol from his back pocket. He told her not to press any buttons and then grabbed the front of her shirt, pulling it downward and exposing her bra. He dragged her to a hallway at the back of the store and threw her to the floor, causing her head to strike it twice. Next, he dragged her by the hair to a break room and again threw her down, repeatedly striking her head against the floor. He stood over her and put the gun against the back of her head. She heard a click. During all this time, he was yelling at her, calling her bitch, and angrily demanding to know where the rest of the money was. She said there was none. He dragged her back to the front of the store and then to the rear again, becoming angrier and angrier as she continued to insist there was no more money. Finally, he dragged her to the bathroom, threw her inside, and ordered her to remove all her clothes. He closed the door. The lights were off. She took her clothes off, crying. She thought he was going to rape and kill her. Instead, he pulled a towel rack off the wall and hit her over the head with it. He yelled some more, and then left. She heard the robbers leaving the store through the back door, which led to an alley. Then she hit a panic button in the bathroom and ran out and called 911. The ordeal took about 30 minutes. About $1,800 was taken from the cash registers.

On the day of the robbery, Martinez observed two men at in-field show-ups, but they were not the robbers. On October 27, 2011, the day after the robbery, Detective Luma Fahoum showed Martinez two photo lineups that did not include defendants but did include other men Fahoum was investigating. In one lineup, Martinez selected the photograph of the person of interest, saying she was not sure but thought he resembled the short robber. In the other lineup, she said the person of interest looked more like the tall robber than any of the other people pictured, but was not him. Over the next few days, Fahoum showed Martinez two more photo lineups, and a Detective Jennings showed her one. From one of the lineups presented by Fahoum, Martinez set one picture aside, saying it looked more like the short robber than the others, but was not him. From the final lineup presented by Fahoum, Martinez selected a photo of Lawton, saying she was 90 percent certain. The lineup presented by Jennings included a photo of Langston, but Martinez did not select anyone from that lineup.

Martinez came to the courthouse under subpoena on the day of the preliminary hearing. Fahoum asked her to look through the window in the courtroom door at the dozen inmates (including five African-American men) assembled inside and say whether either of the robbers was there. Langston was among them, but not Lawton. Martinez identified Langston as the short robber. Martinez also identified both defendants as the robbers at trial. She said she was certain about both.

Robert Douglas, a police technician, testified that he viewed surveillance videos taken by home security systems at two houses on the street behind the shopping center where Check into Cash was located. The videos showed a black Chrysler

300 driving into the alley behind the shopping center at 3:32 p.m. on the day of the robbery. They showed the same car emerging from the alley at 3:45 p.m. Video clips and still photos from the videos were shown to the jury. Jacob Huerta, a recruiting sergeant who worked at an army recruiting station near Check into Cash, testified that he was out running with a group of recruits after 4:00 p.m. on the day of the robbery. He saw the black Chrysler 300 parked behind the Check into Cash building. He noticed it because he passed the same spot every day and ordinarily there were no cars parked there. Someone was sitting in the front passenger seat. He told an investigating officer he thought it was an African-American woman.

In the van with defendants when they were arrested was a wig with long, black, matted hair. Martinez told Fahoum it was the wig worn by the tall robber and identified it again at trial. The van also contained a black messenger bag and a dark blue baseball cap with a white embroidered New York Yankees insignia.

Harper sent a text message to Lawton on the morning of the robbery. "Let me know what's up, my wife don't go this morn, so let me know what the lick read this day, if it ain't, it is [what] it is." Harper's wife, Marion, was not going to court for jury duty that day. She did have jury duty on 10 other dates in October and November 2011. Later that morning, Harper sent Lawton another message: "Let's go u don't have 2 say that, let's go, call it n make it with it b it murder n mayhem." About two hours after that, Lawton texted Harper, "Ima picc up tiny now." The following night, after the robbery, Lawton texted Langston: "Checc out visaliatimes.com on ur phone it say that too men fled on foot."

Cell tower data indicated that, prior to the robbery, Lawton's phone moved northward toward Visalia from the direction of Bakersfield. Half an hour to an hour before the robbery, Langston's phone used a Visalia tower. At the time of the robbery, Lawton's phone used the tower and sector serving the location of Check into Cash. Afterward, Lawton's and Langston's phones moved southward back to Bakersfield.

This was the only robbery (count 6) for which Langston was not charged.

### Max Muscle, Bakersfield, October 30, 2011

Breon Mosley, 18 years old at the time of trial, was present at the commencement of the Max Muscle robbery and testified about the incident for the prosecution. Mosley's girlfriend, Sherri, lived near a Fastrip gas station on the corner of White Lane and Gosford Road in Bakersfield. Around midnight on October 30, 2011 (that is, the morning, not the evening, of October 30), Mosley called Jamiya Chandler and asked her to drive him to Sherri's house. Chandler arrived in a white van with Lawton and Langston. On the way to Sherri's house, they stopped at the Fastrip for snacks. A surveillance video from Fastrip showed the van arriving at 12:09 a.m. Mosley saw light coming from the open door of an adjacent business. According to Mosley's statement to police, Lawton and Langston looked at the open door, looked at each other, and smiled. The van pulled away from Fastrip at 12:16 a.m. It parked about a block away. Lawton and Langston got out, taking some dark sweaters, and walked away.

Mosley and Chandler drove back to Fastrip to get gas, arriving there at 12:21 a.m. Before leaving again at 12:24 a.m., Mosley heard three gunshots.

Mosley and Chandler drove on to Sherri's house. After 20 or 25 minutes, Lawton and Langston arrived, sweating and out of breath. Langston said someone had been shooting at them. Lawton said he had had to climb over a brick wall and some gates to get to the house. Mosley did not want to know what they had been doing and did not ask any questions.

Max Muscle was a store that sold vitamins, protein supplements for athletes, and similar products. It was located at 8000 McNair Lane, with its back door facing Fastrip at White Lane and Gosford Road. Jeff Revelle and Yvonne Carreno were the owners. Revelle and Carreno were boyfriend and girlfriend at the time of the robbery and husband and wife at the time of trial. They came to the store around 11:30 p.m. on the night of the robbery to collect money from the safe, drop off some supplements, and do some cleaning. They entered through the back door and left it ajar.

Carreno was cleaning the bathroom and Revelle was at the counter with two envelopes of money when two men entered the store. One man was African-American, about six feet two inches tall, about 30 years old, 240 to 250 pounds, and muscular. He was wearing a dark, puffy winter jacket and a purple baseball cap. He was chewing on a coffee-stirring straw. The other man also was African-American, five feet five or six inches tall, and about 150 pounds. He was wearing a hooded sweatshirt with the hood up. Both were holding semiautomatic handguns.

Carreno testified that the tall robber approached her from behind in the bathroom, told her not to move, and then left the bathroom. She saw Revelle on his knees by the counter. Then one of the robbers closed the bathroom door with Carreno inside. She heard the robbers ordering Revelle to give them money. Soon the bathroom door burst open and the short robber entered and pointed his gun at Carreno's face. He was "very agitated" and "very hyper." He ordered her to take her "fuckin' clothes off." She pleaded with him, but he called her bitch and said he would "fuckin' kill" her if she did not comply. When she stripped to her underwear, he told her to "take it all off" and again threatened to kill her. He was pointing the gun at her face as these things happened and she feared he would rape her.

Revelle testified that he was at the counter when one of the robbers came from behind, put a gun to his head, and ordered him to go to the back of the store and get on the floor. The short robber took the envelopes of money and demanded more. Revelle said he thought there might be more money in his car. The tall robber turned as if heading out to Revelle's car. Revelle had a compact handgun in his pocket and now drew it and tried to fire at the tall robber. The gun failed to fire the first two or three times Revelle pulled the trigger. The tall robber said, "[H]e's got a gun." The short robber emerged from the bathroom and both robbers fled from the store. Meanwhile, Revelle had unjammed his gun. He ran out after the robbers and fired five or six times. The money taken totaled $6,000 to $7,500.

Sergeant Stratton showed a photo lineup to Carreno on November 1, 2011. The lineup included Lawton. Carreno ruled out the other five pictures, but was only 50 percent sure the remaining picture (Lawton's) was of one of the robbers. She did not mark any of the photos.

Stratton also showed Revelle a lineup including Lawton on November 1, 2011. Revelle did not mark any of the photos. He told Stratton he thought either Lawton or a second pictured man could be the tall robber.

Another officer showed Carreno another lineup on November 3, 2011. This lineup included Langston. Carreno selected a picture of a different person, however. Revelle also was shown a lineup including Langston that day. He selected a photo of someone else.

At Carreno's request, Stratton later showed her several additional still pictures of Lawton, the man about whom she was 50 percent certain. After viewing these, Carreno was 80 percent sure Lawton was the tall robber.

After Lawton and Langston were arrested, Revelle and Carreno heard their names on the news and looked them up on Facebook. They found Lawton's Facebook page and looked at photos of him there. Both were sure he was the tall robber.

Carreno and Revelle came to court under subpoena on the day of the preliminary hearing. Detective Dossey led Carreno and Revelle separately to the window in the courtroom door and asked them to view the inmates inside. Lawton, Langston, and another African-American man were there, along with several people in suits. Carreno and Revelle identified Lawton and Langston as the robbers. At trial, they identified Lawton and Langston as the robbers again, both expressing complete certainty.

The jury was shown surveillance videos taken by four cameras in the store. The camera angles are high and the robbers' faces are usually obscured by the hat and the hood, but the tall robber's face is sometimes visible in profile. Dossey testified that, in his opinion, the tall robber in the video appeared to be Lawton.

The Fastrip surveillance video showed an African-American man entering the store wearing a black baseball cap with a red brim and a white logo on the front, a red button-down shirt, and red tennis shoes with a white stripe around the base. Lawton was wearing shoes of this description when arrested, and a hat that looked the same was in the van in which defendants were arrested. Also in the van with defendants when they were arrested was a chewed coffee stirring straw and a newspaper article describing the Max Muscle robbery.

Cell phone records showed that, on the evening of October 26, 2011, Lawton and Langston exchanged text messages in which they planned to pool their money to rent a van and take a trip to Los Angeles. John Darling, a branch manager for Enterprise Rent–A–Car, testified that a man named Andrew Reynolds rented a white Chrysler Town & Country minivan from him on October 28, 2011. On October 31, 2011, Reynolds returned the van and rented another just like it. That day, Reynolds was accompanied by a second man. Darling testified that Lawton looked like the second man.

Harper texted Lawton on October 29, 2011, to ask, "What the lick read." On the afternoon of October 30, 2011, after the robbery, Langston exchanged text messages with a correspondent called Alicia. John Darling complained that Langston was out of contact for two days. Langston replied that he was recovering from bruises, cuts, and a swollen ankle sustained when someone jumped him at the Fastrip on White Lane after he got dropped off to go to the store.

Cell tower data showed that Lawton's phone was in Southern California between 6:30 and 8:00 p.m. the night of the robbery, using towers in Torrance. Around 10:30 p.m. it was back in Bakersfield and was using towers that covered 8000 McNair Lane around midnight. It continued using towers in that area until around 2:00 a.m., then moved across town to the east. Langston's phone also was in the

area of 8000 McNair around midnight and was still there around 10:00 a.m. the next morning. Sherri's house was in the same vicinity as Max Muscle, as mentioned above.

### Allied Cash Advance, Delano, November 2, 2011

Maria Guillen and Alex Diaz testified that they were working at Allied Cash Advance at 1015 Cecil Avenue in Delano around 3:45 p.m. on November 2, 2011. Allied Cash Advance was a business that made cash loans to customers.

A tall man and a short man came to the door and tried to enter. The tall man was wearing a black jacket, a golf cap and sunglasses, and the short man was wearing a colorful checked shirt and carrying a black backpack. Both were African-American. The short man was the younger of the two. The door was locked. Guillen and Diaz were counting money and gestured to the men to return in five minutes. They walked away.

The tall man returned and entered the store about 10 or 15 minutes later. He had removed his jacket, hat, and sunglasses and was wearing a short-sleeve white shirt. Diaz saw tattoos on his left arm. He inquired about a car title loan, but he said he had no car with him. Diaz felt something was amiss and began leading him out of the store.

As Diaz was opening the door to let the tall man out, two other men rushed in wearing black bandanas on their faces. The tall man pushed Diaz back inside. The two masked men were African-American. One was shorter than the other and both were shorter than the tall man. The shortest robber had a gun. Guillen and Diaz believed the armed man looked similar to the one who had first appeared with the tall man when the door was locked.

The two masked robbers attacked Diaz, the shortest one beating Diaz's head bloody with the gun. The other masked robber jumped over the counter, threw Guillen to the floor, and ordered her to open the safe. She entered her code. The safe had a 15-minute time-delay lock. The masked robbers made Diaz lock the front door and then emptied the cash register drawers. The tallest robber stood outside. Diaz thought he was telling customers the store was closed. Diaz's and Guillen's cell phones were taken, as well as Guillen's engagement and wedding rings.

The shortest robber took Diaz to the back of the store and ordered him to lie on the floor and remove his clothes. He pointed the gun at Diaz and told him he was going to die. After Diaz stripped to his underwear, the shortest robber moved him back to the front of the store. The other masked robber taped Diaz's wrists together with duct tape.

The shortest robber next hit Guillen on the head with the gun and dragged her to the back of the store by her hair. He called her bitch, ordered her to undress, and became angry when she did not remove her underwear. He ripped her bra off and she took off her underpants. He pushed her down. Then he asked if she had any children. When she said yes, he said, "[W]ell, think of this day as being the last day that you saw them." As she lay on the floor, he stomped on her neck and back. Then he got on the floor and ran the gun down her back while breathing in her ear. Finally, the safe made a sound indicating the 15 minutes were up. The shortest robber went to it.

One of the robbers tore the tape off Diaz's wrists. Diaz opened the safe and handed over the money. Then the masked robbers pushed Diaz and Guillen into a bathroom and left the store through the back door. As they left, one said, "[W]e have your IDs, we know where you live, give us 15 minutes before calling the cops."

A photo lineup presented to Guillen the same day included a picture of Lawton, but Guillen identified a filler as the tall robber. On November 10, Guillen viewed two more photo lineups, one including Lawton and one including Langston. Guillen did not select anyone from those lineups. On the day of the preliminary hearing, Guillen came to the courthouse under subpoena and met an investigator, who asked her to look into the courtroom through the window in the courtroom door. She recognized Lawton, who was standing, as the tallest robber and Langston, who was sitting in the jury box with some other men, as the shortest. She identified defendants as two of the robbers at trial as well.

When asked why she could not identify defendants in the photo lineups, Guillen testified that she been severely affected by the ordeal. She said she suffered posttraumatic stress disorder and was admitted to a mental hospital a few days after the robbery.

Diaz viewed photo lineups on November 2 and November 17, 2011. He made no identification in a lineup that included Langston and no identification in a lineup that included Lawton. In a third lineup, he selected Lawton as the tallest perpetrator. After seeing the lineups, Diaz watched a news report about defendants' arrests. The report included video of defendants. When he saw the video, he was convinced that Lawton was the tallest robber and Langston was the shortest. When a detective asked Diaz to look through the courtroom window on the day of the preliminary hearing, Diaz said he did not need to look because he had already identified defendants in lineups and had recognized them in the news video. Diaz identified defendants at trial as the tallest and shortest robbers. Lawton was asked at trial to roll up his sleeve to reveal the tattoos on his left arm. Diaz testified that the tattoos were in the same locations as the tattoos he saw on the tallest robber, but the ink of Lawton's tattoos in the courtroom appeared darker than what Diaz saw during the robbery. Diaz could not say whether the tattoos were similar in other respects.

An employee of a credit union near Allied Cash Advance testified that his business had a surveillance camera pointed at the adjacent parking lot of a Chinese restaurant. The surveillance video showed a white minivan entering that parking lot at 2:02 p.m. The van stayed in the parking lot until around 2:15 p.m.

With Lawton and Langston in the white minivan when they were arrested were a red, white, blue, and yellow plaid shirt and a black and brown cap. At trial, Guillen identified them as the shirt worn by the short man who first appeared at the door with the tall man, and the hat worn by the tall man. Other items found in the van included a black backpack, a sock filled with 93 nine-millimeter bullets, and a receipt from the Kern County Sheriff's Department for funds placed in the jail accounts of Maurice Spellman and Tracy Herring. Langston had $1,022 in cash in his pocket, $900 of it in $100 bills.

A roll of duct tape was also found in the van. Dianna Matthias, a criminalist employed by Kern County, testified as an expert about her comparison of the end of the tape on this roll and an end of the duct tape with which Diaz's hands were bound, which was found on the floor of Allied Cash Advance. She concluded that

they matched: "In my opinion, no other tape roll would match that particular piece of tape."

On October 31, 2011, after the Max Muscle robbery but before the Allied Cash Advance robbery, Langston and Lawton exchanged text messages. Langston wrote, "Spooky lets lurkin for this money later [I've got] a spot we can hit today." Lawton replied, "Turk." Turquoise was the color of the West Side Crips. According to Sergeant Stratton, West Side Crips members sometimes made a pledge or oath "on turq." The next day, November 1, Brains (i.e., Deontre Miller) texted Lawton: "Top of the morning time to get money this nb up and ready [.] [¶] We still going[?]" Later that morning, Miller texted, "What's up [?] [W]e on[?]." Lawton answered, "Yea give me a few." At 3:40 p.m. on November 2, a few minutes before the Allied Cash Advance robbery, Chandler texted Lawton: "10 minute wait." Lawton replied, "K." Chandler wrote, "An nobody in here but 1 old lady an cook an u cant see the car."

Cell tower data showed that Lawton's phone was in Bakersfield around 1:00 p.m. on November 2, 2011, but had moved to Delano by about 2:00 p.m. Between then and around 4:15, Lawton's phone made 15 calls through a Delano tower. Subsequently, it used towers indicating it was traveling south toward Bakersfield. Records for Chandler's phone showed a similar pattern.

### *People's gang expert*

Officer Holcombe testified as the prosecution's gang expert. He opined that the West Side Crips were a criminal street gang within the meaning of section 186.22, one of several African-American gangs in Bakersfield. He discussed the West Side Crips' territory, color, symbols, hand signs, tattoos, graffiti, monikers used by members, and rivals and allies among other local gangs. He said the primary activities of the West Side Crips included drug sales, burglary, robbery, firearm possession, assaults with deadly weapons, and murder. These activities raise money for the gang and enhance its reputation for violence and fearsomeness. The gang had about 100 members as of the end of 2011.

Holcombe testified that the gang's members engaged in a pattern of criminal gang activity. To establish this, he described six cases in which West Side Crips were convicted of a number of crimes, including a murder, an attempted murder, two robberies, a grand theft from a person, and a possession of marijuana for sale. The grand theft from a person and the marijuana possession were committed by Lawton; he received sentences of four years and 16 months, respectively.

Holcombe opined that Lawton was a member of and an active participant in the West Side Crips. This opinion was based on research on numerous pieces of information about Lawton, in addition to the two offenses just mentioned. These included offense reports (police records of arrests), street checks (police records of consensual contacts), booking records, statements from other officers, and Lawton's Facebook page.

Lawton had a gang moniker, as noted above, and on his Facebook page were pictures of him wearing clothing associated with the West Side Crips, including a Washington Nationals baseball hat, which was in the West Side Crips' color and had a W on the front. Lawton had numerous tattoos, one of which had a gang association because it included words spelled with "cc" instead of "ck."

19

On four occasions when Lawton was being booked in to the Kern County Jail (two in 2002 and two in 2011), he affirmed an association with the West Side Crips and asked to be housed away from members of certain other gangs. There were other bookings during which Lawton declined to claim a gang association.

Holcombe discussed 11 offense reports involving Lawton from 2000 to 2011. In nine of these incidents, Lawton was arrested. In each offense report, Lawton was described as admitting gang membership, being in the company of gang members, being in gang territory or at a gang hangout, or being arrested for a crime that is a primary activity of gangs or related to a primary activity of gangs. The offenses for which Lawton was arrested included auto theft, possession of stolen property, possessing drugs for sale, forgery, and being an active member of a criminal street gang. Holcombe also testified about seven street checks in which Lawton admitted to membership in or association with the West Side Crips or was in the company of other West Side Crips. In an eighth street check, Spellman said Lawton was his brother and was a West Side Crip.

Next, Holcombe discussed seven men with whom Lawton was associated in the offense reports and street checks. All were members or associates of the West Side Crips. Holcombe also went through a series of text messages sent from Lawton's phone in which Lawton communicated with other gang members; planned crimes; negotiated drug deals; discussed gun purchases, bail arrangements, and car rentals; and used gang monikers, terms, and spellings. Holcombe opined that gang members use rented, borrowed, or stolen cars when committing crimes to hamper detection.

Holcombe also opined that Langston was a West Side Crip member and active participant. His opinion was based on similar data. Langston had a gang moniker. On his left wrist and forearm was a tattoo of a left hand holding a semiautomatic pistol. On Langston's phone were photographs showing him pointing a semiautomatic pistol, displaying several large jars containing green clumps that appear to be marijuana, and holding up his hands with the fingers in the shape of a W and a C, which is a West Side Crip gesture. In two of these pictures, Langston wears a Pittsburgh Pirates baseball hat with the letter P on the front. The West Side Crips use the letter P as a gang symbol because P Street runs through the center of their territory. Holcombe also relied on three pictures Langston transmitted with his phone with attached messages. One is a picture of him smoking with the message "Turqmafia"; the second also shows Langston smoking and says "The Don"; and the third shows him sitting in a car with another gang member (James Curr Robinson, known as Baby E–Loc) and has the message "[t]he locs are coming home." A final picture from Langston's phone shows him posing with Robinson.

When he was booked in to jail in the present case, Langston said he was an East Side Crip and should be kept away from Bloods (a claim that puzzled Holcombe, since all the other evidence was that Langston was a West Side Crip, and the East Side and West Side Crips are rivals). In 2007, when Langston was 13, he and two others assaulted another juvenile in a park and said he could not play there because he was not from the West Side. In 2010, when he was 16, Langston was arrested at a West Side Crip's house and charged with being in possession of a firearm. He admitted to being a West Side Crip on that occasion and said his moniker was Tiny E–Loc. The contact list in Langston's phone included West Side Crip members or associates—Lawton, Harper, Mosley, and Robinson—and Langston's girlfriend, "Doness Ladii Loc." Text messages found via a search of Langston's phone were delivered to gang members and associates; used gang

terms, monikers, and spellings; and discussed gang members' activities. These included the message described above in which Langston described himself as "being from the mob."

Finally, Holcombe opined that a set of hypothetical crimes based on the facts of the charged offenses would be committed for the benefit of, at the direction of, or in association with the West Side Crips. They would be for the benefit of the gang because the violence and use of firearms would promote the reputation of the gang as a force to be feared and would advance the individual members' status within the gang; further, the money stolen would benefit the gang by providing funds to underwrite future criminal activities (e.g., the cost of rental cars, weapons, and drugs to be sold), bail and commissary funds for incarcerated members, and the gang lifestyle. The crimes would be in association with the gang because Langston, Lawton, and other gang members and associates planned and committed the crimes together and gained a variety of advantages by doing so. The crimes would be at the direction of the gang because they involved an older member, Lawton, planning the crime and directing a younger member, Langston, in its execution.

### Defense evidence

Lawton testified in his own defense. He said he was not a West Side Crip and had never claimed to be one. No booking deputy ever asked if he had a gang affiliation. He wore a Washington Nationals hat with a W because he was a Washington Nationals fan. He substituted "cc" for "ck" in his tattoos and text messages only to avoid disrespecting Crips, not because he was a Crip. The phone that was admitted into evidence as the phone taken from him when he was arrested was not his phone. He saw an officer take it from the trunk of a police car and place it with his property. The officer did this after having a phone conversation with Stratton. Lawton's phone was often used by various other people, and he did not have it with him when he was arrested. He was not involved in any of the charged crimes. He was at the Fastrip in a rented white minivan with Chandler just before the Max Muscle robbery. He had an argument with Chandler, got out of the car, and walked to the home of another girlfriend. Langston was not with them in the van. On the day of the last robbery, at Allied Cash Advance in Delano, Lawton was in Delano securing a location for filming a video. He used rental cars a number of times in September, October, and November 2011 to transport himself and others to concert venues as part of his work as a music producer. He did not know there was a gun in the van when he was arrested. He did not know Langston was a West Side Crip and did not exchange text messages with Langston containing anything he considered gang terminology.

Jermaine Pugh testified that he worked with Lawton in a business that produced and recorded music. Lawton introduced Langston to Pugh as a potential artist. Pugh and Lawton planned to make a promotional tape for Langston and a cover for the tape with photos. Pugh suggested including photos with themes of street violence, money, and women. Pugh said a photo of Langston holding a gun would be consistent with these themes.

Bernard Harold testified as an alibi witness for Langston for the night of the Max Muscle robbery. Harold was Langston's half-brother. On October 29, 2011, Harold threw a birthday party for himself at his mother's house. The attendees, whom Harold described as "gang people, all my family," drank Jell–O shots and smoked marijuana. After the party, around midnight, Harold, his girlfriend, and

Langston went out to drive around and continue smoking marijuana. They stopped at a park so Langston could urinate and Harold could vomit. After throwing up, Harold turned around and saw three men attacking Langston. Harold ran over to help Langston but Langston ran away. The attackers chased him. Harold got back in the car with his girlfriend and drove around for awhile looking for Langston but they did not find him that night. They could not call him because they had only one phone among them and Langston took it with him. Harold said several people shared Langston's phone.

On cross-examination, Harold was asked whether he had had any contact with Langston in the 15 months before trial. Harold said no. He denied that he was Langston's cellmate at the Lerdo Pretrial Facility where both were currently housed.

A deputy sheriff testified as a rebuttal witness that Langston and Harold were cellmates from January 4, 2013 to January 29, 2013, the latter date being the day Harold testified. Harold asked to be moved to a different cell that afternoon.

The defense called J., the younger sister of Michelle Castellanos and a witness to the Gold Rush Jewelers robbery. She testified that an officer showed her two photo lineups on November 8, 2011, one including Langston and one including Lawton. J. selected a filler from each lineup. On the day of the preliminary hearing, J. was asked to look through the window in the courtroom door and say whether she saw the robbers. She identified someone inside as the short robber.[6] At trial, J. identified defendants as the robbers.

Langston, 2016 WL 2963353, at *1–20 (footnotes in original).

### III.

### STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Kern County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is

---

[6] The parties' briefs do not point to places in the record indicating whether the person J. selected was Langston or whether Lawton was in the courtroom at that time.

therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–13; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" <u>Williams</u>, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id.</u> If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." <u>Richter</u>, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. <u>Id.</u> If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. <u>Stanley v. Cullen</u>, 633 F.3d 852, 859 (9th Cir. 2011); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121,

1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A. Bifurcation

In his first claim for relief, Petitioner asserts that the trial court erred in failing to bifurcate the gang offense and enhancements. (ECF No. 1 at 6).[7] Respondent argues that the state court's denial of this claim did not violate any clearly established United States Supreme Court precedent. (ECF No. 11 at 20).

Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court

---

[7] Page numbers refer to ECF page numbers stamped at the top of the page.

summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 568 U.S. 289, 297 n.1 (2013); Ylst, 501 U.S. at 806.

In denying Petitioner's bifurcation claim, the California Court of Appeal stated:

Defendants were charged with gang enhancements (§ 186.22, subd. (b)) in counts 1 through 13 and with gang-related gun-use enhancements (§ 12022.53, subd. (e)(1)) in counts 1 through 7, 9, 10, and 13. They also were charged with the substantive offense of active street-gang participation (§ 186.22, subd. (a)) in count 14. They moved to bifurcate the trial so the gang and gang-gun enhancements could be presented to the same jury separately and to sever the gang charge so it could be tried in a separate trial. After an Evidence Code section 402 hearing at which the prosecution's gang expert laid out his testimony, the trial court denied the motions. Defendants now argue this was an abuse of discretion.

A threshold problem involves the difference between bifurcation and severance. Because severance, unlike bifurcation, ordinarily involves the empaneling of a separate jury for a separate trial, the considerations necessary to justify granting a motion to sever might be weightier than those that would necessitate bifurcation. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1050 (*Hernandez*).) At trial, the court and parties briefly referred to this difference and to the notion that it might make sense to allow the substantive gang charge to be merely bifurcated, not severed, along with the enhancements. The idea was not followed up, however, and defendants did not ask the court to act on it. In his opening brief on appeal, Langston acknowledges there is no authority for the view that a count, as opposed to an enhancement, could be bifurcated instead of severed; but he argues that, where a defendant is charged under both subdivisions (a) and (b) of section 186.22, this procedure would be supported by common sense. He urges us to apply it here.

This notion, if accepted, would lighten the burden of a defendant seeking to separate matters pleaded under section 186.22, subdivisions (a) and (b), from the remainder of the case. A motion for severance, as we have mentioned, generally requires the moving party to overcome a higher hurdle than a motion for bifurcation. If a defendant fails to obtain severance of a gang charge, the trial court will also deny bifurcation of a gang enhancement, since the gang evidence will have to be admitted in the guilt phase to prove that charge. The approach suggested by Langston would eliminate a defendant's need to prevail on the motion for severance in this type of situation. Therefore, it would defeat the utility, from the prosecution's perspective, of filing a section 186.22, subdivision (a), charge as a means of avoiding bifurcation of section 186.22, subdivision (b), enhancements.

Langston's argument that bifurcation procedures should be allowed to be applied to a substantive gang-participation charge in a case like this is, for these reasons, an interesting argument. We have no occasion to decide the question here, however. As we will explain, the court here would have had discretion to deny bifurcation independently of the question of severance.

A trial court has discretion to bifurcate the trial in a case with gang enhancements to avoid the danger of the jury being improperly influenced by the gang evidence when it decides whether the defendant is guilty of the charged crime. (*Hernandez, supra,* 33 Cal.4th at p. 1049.) Predicate offenses and other gang evidence "may be so extraordinarily prejudicial, and of so little relevance to guilt, that [they threaten] to sway the jury to convict regardless of the defendant's actual guilt." (*Ibid.*)

Despite these considerations, "less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Hernandez, supra,* 33 Cal.4th at p. 1048.) This is because "[a] prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense." (*Ibid.*) Further, because there are efficiencies to be gained by conducting a nonbifurcated trial, some evidence that would be inadmissible (under Evid.Code, § 352, for instance) at a trial of the underlying crime alone can be admitted in a nonbifurcated trial of an offense with a gang enhancement. (*Hernandez, supra,* at p. 1050.) The burden is on the defendant to show that the considerations favoring a nonbifurcated trial are substantially outweighed by a danger of undue prejudice. (*Ibid.*) The danger of undue prejudice must be clearly established by the defendant. (*Id.* at p. 1051.) On appeal, the trial court's ruling on bifurcation is reviewed for abuse of discretion. (*Ibid.*) A court abuses its discretion only if its decision exceeds the bounds of reason, contravenes the uncontradicted evidence, fails to follow proper procedure, or applies the wrong legal standard. (*Conservatorship of Scharles* (1991) 233 Cal.App.3d 1334, 1340.)

The trial court acts within its discretion when it denies a bifurcation motion if the gang evidence will be admissible to prove the charged offenses. "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Hernandez, supra,* 33 Cal.4th at pp. 1049–1050.)

It is well established that when there is evidence of a gang motive for a crime, gang evidence about the defendant can be admissible to prove guilt, since it can help identify the defendant as the perpetrator under those circumstances. (*People v. Williams* (1997) 16 Cal.4th 153, 193–194; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518.) Gang evidence can also help prove identity directly, for instance, when a defendant is a gang member and a perpetrator wore gang clothes or used gang terminology or gang methods. These theories of admissibility show the court was not required to grant defendants' bifurcation motion in this case, as we will explain.

Defendants acknowledge the main question for the jury was that of identity, i.e., whether defendants were the tall man and the short man who committed the robberies. There was a great deal of nongang evidence relevant to this question, but there also were conflicts and weaknesses in the evidence. For instance, the victims identified defendants as the robbers at trial, but in a number of instances, the same witnesses initially failed to identify defendants in photo lineups. Data from defendants' cell phone service providers showed that their phones were in

the vicinity of the robberies when the robberies took place, but there was evidence that defendants shared their cell phones with others. Clothing matching that of the robbers was found in the van with them when they were arrested, but they were not wearing it and others had ridden in the van. Surveillance videos showed robbers who could have been defendants, but the images were unclear.

The prosecution's case on identity thus depended on a complex web of evidence. The fact that defendants were gang members was an important part of this web. It supplied defendants with a motive to commit the robberies, since gang members in general commit robberies to help sustain their gangs, and the evidence showed that these particular gang members were so motivated as they planned these crimes. The prosecution's expert testified about this motive as a general phenomenon, while the text messages showed that defendants personally had a gang-related robbery motive, as they revealed defendants' involvement with other gang members and associates in drug transactions, gun purchases, and efforts to give financial help to incarcerated gang members or associates. Further, the expert said gang members use violence and intimidation to promote their gang's reputation and their own reputations within the gang, and the robbers' behavior as described by some of the witnesses conformed to this pattern. The acts of forcing victims to undress, beating them, and dragging them around by their hair amounted to gratuitous violence and humiliation, unnecessary for the mere taking of money. Finally, there was expert opinion evidence that gang members often operate in pairs of an older and younger member, the latter in training with or apprenticed to the former. The robbers and their conduct, as described by witnesses, conformed to this pattern as well. The text messages between Lawton and Langston tended to show they were in this type of partnership together.

This is not a case in which generic expert testimony "was used to create a motive not otherwise suggested" by evidence specific to the crimes or the defendants. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 226 (*Albarran*).) It is not a case in which, for instance, victims were robbed and gang evidence was admitted merely because gangs have an economic incentive to commit robbery. A gang motive was indeed suggested by evidence specific to the crimes and defendants, as the above examples show.

Defendants argue that, even if the gang evidence had probative value on the issue of guilt, bifurcation was required because the considerations favoring a nonbifurcated trial were substantially outweighed by a danger of undue prejudice. (*Hernandez, supra,* 33 Cal.4th at p. 1050.) We disagree.

The probative value of the gang evidence for the issue of guilt was considerable in this case, for the reasons we have mentioned. The gang evidence gave significant support to the prosecution's case for identity. Gang evidence can have a strong prejudicial effect, as has often been held (see, e.g., *Hernandez, supra,* 33 Cal.4th at p. 1049), but this effect does not substantially outweigh the probative value where, as here, it is relevant and important in establishing guilt.

Lawton's brief argues he was especially prejudiced by the denial of the bifurcation motion because the gang evidence about him included evidence of his own prior offenses, including evidence of a grand theft from a person, a crime similar to robbery. He also stresses that the other gang evidence about him included extensive evidence of arrests, jail bookings, and other law-enforcement contacts. We are not persuaded that these features of the gang evidence compelled bifurcation.

For these reasons, the bifurcation motion was properly denied. Further, since the gang evidence and the evidence of guilt of the underlying charges were properly presented in a unified trial, there would have been no purpose in severing the gang-participation charge. Therefore, the court acted within its discretion in denying the severance motion as well.

Defendants add the argument that the rulings denied them due process of law under the federal Constitution. (*Albarran, supra,* 149 Cal.App.4th at p. 229 [presentation of evidence denies due process " '[o]nly if there are no permissible inferences the jury may draw' " from it and it is " ' "of such quality as necessarily prevents a fair trial" ' "].) Since the gang evidence here was relevant to guilt and not unduly prejudicial, its presentation in a unified trial was not a due process violation. Defendants' "claims of federal constitutional error, entirely dependent as they are on [their] claim of state law error, likewise must fail." (*People v. Carter* (2003) 30 Cal.4th 1166, 1196.)

In the trial court, at least Langston made an alternative request that, if the trial court were to deny bifurcation, it should at least limit the gang evidence by excluding specific items of it. Neither defendant has made an alternative argument of this kind on appeal.

Langston, 2016 WL 2963353, at *22–25.

Spencer v. Texas, 385 U.S. 554 (1967), upheld Texas's recidivist trial procedures, which allowed introduction of proof regarding a defendant's past convictions with limiting instructions to the jury that such proof was not to be considered in assessing guilt or innocence under the pending criminal charge. The Supreme Court in Spencer noted that "[t]wo-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law." Id. at 568. The Ninth Circuit has relied on Spencer to reject a petitioner's claim that his trial, specifically the criminal street gang enhancement, should have been bifurcated, finding that such a claim does not implicate federal law. Adams v. Jacquez, 554 F. App'x 610, 611 (9th Cir. 2014), aff'g No. 2:10-cv-2266 JAM KJN, 2011 WL 3563158 (E.D. Cal. Aug. 11, 2011).[8]

In light of Spencer and Adams, the Court finds that Petitioner's bifurcation claim does not implicate federal law. Therefore, the California Court of Appeal's denial of Petitioner's bifurcation claim was not contrary to, or an unreasonable application of, clearly established federal law,[9] nor was it based on an unreasonable determination of fact. The state court's

---

[8] Although circuit caselaw is not governing law under AEDPA, Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents." Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc).

[9] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker v. Small, 665

decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his first claim, and it should be denied.

## B. Improper Admission of Expert Testimony

In his second claim for relief, Petitioner asserts that introduction of expert testimony regarding duct tape violated his right to a fair trial "because the trial court did not ensure that any and all scientific testimony or evidence admitted is not only relevant, but, also reliable." (ECF No. 1 at 9–10). Petitioner challenges the reliability of the expert testimony because "[t]here was no validation of techniques utilized by [the expert], no peer-checking, and no other expert validating the techniques used here . . . ." (Id. at 9). Respondent argues that the claim is unexhausted but should be denied on the merits because it is not cognizable in federal habeas corpus. (ECF No. 11 at 27).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. In the petition for review to California Supreme Court, however, Petitioner only challenged the California Court of Appeal's holding that the National Research Council report could not be considered on appeal in evaluating the admissibility of subjective pattern-matching evidence of questionable scientific validity and reliability. (LD 8). This implicates exhaustion concerns.[10] However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005).

The Ninth Circuit has held that "habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this

---

F.3d 1143, 1148 n.1 (9th Cir. 2011) (citing Early v. Packer, 537 U.S. 3, 8 (2002)). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

[10] A petitioner in state custody who is proceeding with a petition for writ of habeas corpus generally must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982).

evidence 'undermined the fundamental fairness of the entire trial.'" Gimenez v. Ochoa, 821 F.3d 1136, 1145 (9th Cir. 2016) (quoting Lee v. Houtzdale SCI, 798 F.3d 159, 162 (3d Cir. 2015)). That is, a habeas petitioner must show that the admission of the expert testimony was "so extremely unfair that it[ ] . . . violate[d] fundamental conceptions of justice." Gimenez, 821 F.3d at 1145 (alterations in original) (internal quotation marks omitted) (quoting Dowling v. United States, 493 U.S. 342, 352 (1990)). In Gimenez, the Ninth Circuit found that the introduction of expert testimony based on the triad-only theory of shaken baby syndrome was not fundamentally unfair because the petitioner only presented literature revealing a vigorous debate about its validity rather than a repudiation of the theory. Gimenez, 821 F.3d at 1145.

Here, Petitioner does not demonstrate that Dianna Matthias's testimony regarding tape end matching was flawed or unreliable. Rather, Petitioner merely argues that Matthias's techniques were not validated by other expert testimony at trial. Further, introduction of Matthias's tape end matching testimony did not undermine the fundamental fairness of the entire trial given defense counsel's thorough cross-examination of Matthias. (37 RT 6425–34). As it is "perfectly clear" that Petitioner fails to raise a colorable federal claim, the Court may deny Petitioner's expert testimony claim on the merits pursuant to 28 U.S.C. § 2254(b)(2).

### C. Identification Procedure

In his third claim for relief, Petitioner asserts that the identification procedure utilized at the preliminary hearing was "overwhelmingly prejudicial" and violated his Sixth Amendment right to counsel. (ECF No. 1 at 11–12). Respondent argues that the state court's denial of this claim was reasonable. (ECF No. 11 at 31). This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's identification procedure claim, the California Court of Appeal stated:

### III. Eyewitness identification challenges

Defendants make two arguments regarding eyewitness identifications. First, they contend they were denied their Sixth Amendment right to counsel when police officers led witnesses to the courtroom door to identify them through the window on the day of the preliminary hearing. Second, they argue that several of the identification procedures used, including the procedure at the courtroom door, were improperly suggestive.

#### A. Right to counsel

Several victim witnesses were asked to look through the courtroom window on the day of the preliminary hearing and say if they saw either of the robbers among the inmates inside. At trial, defendants argued that conducting these identifications without notifying counsel and giving counsel an opportunity to be present was a violation of defendants' Sixth Amendment right to assistance of counsel as interpreted in *United States v. Wade* (1967) 388 U.S. 218 (*Wade*). They further claimed that any identifications the witnesses would make at trial would be tainted by the unconstitutional pretrial identification procedure. Defendants moved to suppress.

The trial court heard and denied the motion. It relied on *United States v. Montgomery* (9th Cir. 1998) 150 F.3d 983 (*Montgomery*), which involved a similar identification procedure. In *Montgomery,* the Ninth Circuit applied *United States v. Ash* (1973) 413 U.S. 300 (*Ash*) and held there was no violation of the Sixth Amendment under *Wade.*

Defendants renew their argument based on *Wade* now. The facts are not in dispute, and we review de novo the legal question of whether the right to counsel applies to the situation. (See *People v. Kennedy* (2005) 36 Cal.4th 595, 608–609 [de novo standard applies to claim that identification procedure was unconstitutionally suggestive], overruled on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 459.)

In *Wade,* after the defendant was indicted for bank robbery, an FBI agent arranged a lineup in which the defendant appeared with five or six other prisoners in a courtroom. The defendant had appointed counsel, but counsel was not notified of the lineup. Two victims of the robbery selected the defendant as the robber. They identified him again at trial. (*Wade, supra,* 388 U.S. at p. 220.) The United States Supreme Court held that the Sixth Amendment right to assistance of counsel includes a right to counsel's presence at a postaccusation live lineup, so the admission of the lineup identifications was error. (*Wade, supra,* at pp. 235–236.) A lineup is potentially subject to many suggestive influences, intentional or unintentional. If defense counsel is present, he or she may be able to minimize these at their inception and will be in a position to bring them under scrutiny through cross-examination at trial. An accused without counsel would be comparatively helpless against suggestive influences in the lineup. The lineup therefore was a critical stage of the prosecution to which the right to assistance of counsel applied. (*Ibid.*) The case was remanded for a determination of whether, at a new trial, the victims' trial identifications must also be excluded on the ground that they lacked an origin independent of the illegal lineup. (*Id.* at p. 242.)

In *Ash,* decided only six years after *Wade,* the Supreme Court distinguished *Wade* and held that the Sixth Amendment right to counsel does not require defense counsel to be notified of and have an opportunity to observe a postaccusation *photo* lineup. (*Ash, supra,* 413 U.S. at pp. 318, 321.) The court described a live lineup as a "trial-like confrontation" and an "adversary confrontation." (*Id.* at pp.

314, 317.) The similarity between a live lineup and a trial was "apparent," so the step of extending the right to counsel to live lineups could "easily" be made. (*Id.* at p. 314.) Extending the right yet further to cover photo lineups, by contrast, would be a "substantial departure." (*Id.* at p. 317.) Creating a right to counsel at photo lineups would "*produce* confrontation at an event that previously was not analogous to an adversary trial." (*Ibid.,* italics added.)

Defendants maintain this case is indistinguishable from *Wade.* The vulnerability to suggestiveness of the courtroom-door identification procedure used here is significant, just as in the case of a live lineup. It could be even greater than in the case of a live lineup, since there is no way to ensure the suspect is seen with a sufficient number of people of similar appearance. If defense counsel is not present, he or she has no opportunity to observe suggestive influences that may arise and no ability effectively to cross-examine identification witnesses about these influences.

The People say this case is more like *Ash.* A witness peering through a window, unbeknownst to the defendant, does not create a trial-like, adversarial confrontation. The situation thus is not analogous to those to which the right to counsel traditionally has been held to apply.

The People's view is supported by *Montgomery.* In that case, a witness who had previously identified the defendant in photographs was scheduled to give identification testimony at trial. The day before his testimony, he asked a government agent to take him into the courtroom to look at the defendant in order to reinforce his memory. The agent did so. (*Montgomery, supra,* 150 F.3d at p. 992.) The Ninth Circuit held that this procedure, although it was unnecessarily suggestive (*id.* at pp. 992–993), did not trigger the assistance-of-counsel guarantee. As in *Ash,* "the challenged event was not an adversarial confrontation," and during this event the defendant "was not confronted by a prosecutor with superior knowledge of the law." (*Montgomery, supra,* at p. 995.) As in the present case, the defendant was merely "covertly observed sitting in the courtroom by an identification witness." (*Ibid.*)

Had *Ash* never been decided, defendants' argument would be unimpeachable. Justice Brennan, who authored *Wade* and dissented in *Ash,* no doubt would have agreed with defendants. (See *Ash, supra,* 413 U.S. at pp. 332–333 (dis. opn. of Brennan, J.) [utility of defense counsel at photo lineup at least as great as at live lineup].) But the key concept in *Wade*—defense counsel's need to be present to detect suggestiveness and use any suggestiveness observed as a basis for cross-examination at trial—was supplanted by a new rationale in *Ash.* In *Ash,* the key idea is that the Sixth Amendment right to counsel attaches to trial-like confrontations between the accused and authorities. It does not apply to trial-preparation activities in which the defendant is not confronted. In light of this, we conclude that *Montgomery* is correct and the trial court was right to rely on it.

Defendants cite *Cannon v. Alabama* (5th Cir. 1977) 558 F.2d 1211, which involved an identification procedure very similar to the one at issue here. During the trial, police officers asked an identification witness who had not yet testified to walk down the hall of the courthouse and see if she recognized anyone. She saw the defendant sitting on a bench in the hallway and told the police he was the perpetrator. (*Id.* at pp. 1216–1217.) With little analysis and only a passing reference to *Ash,* the Fifth Circuit held that this was a live identification procedure and, under *Wade,* should not have taken place in the absence of defense counsel. (*Cannon, supra,* at p. 1217.)

We do not think the fact that the subject was identified in person rather than in a photograph is the controlling consideration. The question under *Ash* is whether there was a trial-like confrontation, and we think *Montgomery* reached the correct conclusion about that under circumstances similar to those in this case. When, in *Ash,* the United States Supreme Court changed the basis of its approach to this issue, it cut off the route to an expansion of the right to counsel to identification situations not involving authorities confronting a defendant with a witness. (*Ash, supra,* 413 U.S. 300.) It would be an exaggeration to say *Ash* limited *Wade* to its facts, but it did limit it in a way that bars extending the Sixth Amendment right to counsel to the situation presented here.

Defendants cite several additional cases applying *Wade, supra,* 388 U.S. 218: *Saltys v. Adams* (2d Cir. 1972) 465 F.2d 1023; *United States v. Roth* (2d Cir. 1970) 430 F.2d 1137; *Ruud v. Florida* (M.D.Fla.1972) 343 F.Supp. 212; *Long v. United States* (D.C. Cir. 1969) 424 F.2d 799; *Mason v. United States* (D.C. Cir. 1969) 414 F.2d 1176; and *Rivers v. United States* (5th Cir. 1968) 400 F.2d 935. Only some of these cases involved defendants who were unaware they were being observed, as in this case, and all of them predate *Ash.* The courts in those cases did not have the opportunity to consider how *Ash* impacted the doctrine of *Wade.* Defendants also cite one other post-*Ash* case in which *Wade* was applied, *United States v. LaPierre* (9th Cir. 1993) 998 F.2d 1460, but that case involved a formal lineup. (*Id.* at pp. 1463–1464.) None of these cases undermine our analysis.

For these reasons, we conclude that defendants did not have a right to assistance of counsel at the time when identification witnesses were viewing them through the courtroom door on the day of the preliminary hearing. The trial court did not err in denying the suppression motion insofar as it was based on the right to counsel.

### *B. Suggestiveness of pretrial identification procedures*

Defendants moved to exclude the identification testimony of five witnesses on the ground that their identifications were tainted by improperly suggestive pretrial identification procedures. The witnesses were Michelle Castellanos, Barbara Martinez, Jeff Revelle, Yvonne Carreno, and Maria Guillen. (Two other witnesses were included in the motion, but they did not testify for the prosecution and defendants do not discuss them on appeal.)

The trial court held an Evidence Code section 402 hearing and denied the motion. Defendants now contend this was error. We apply the de novo standard of review. (*People v. Kennedy, supra,* 36 Cal.4th at pp. 608–609.)

Admission of identification evidence is a denial of the right to due process of law if (1) the procedure used to obtain the identification was unnecessary and unduly suggestive, and (2) the identification was unreliable under the totality of the circumstances. A constitutional violation is established only if both of these elements are present. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.) The defendant has the burden of establishing the violation. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) The first element is established by showing that the procedure gave the witness an advance suggestion that the person suspected by the police was the person who should be identified. (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1052.) The second element is shown by such factors as the witness's opportunity to view the perpetrator at the time of the crime and the length of time between the crime and the identification. (*Manson v. Brathwaite* (1977) 432 U.S. 98, 114.)

. . .

Defendants also argue the identifications at the courtroom door on the day of the preliminary hearing were impermissibly suggestive. They point out that the prisoners waiting in the courtroom obviously were prisoners. There is no rule, however, according to which a live identification procedure is unconstitutionally suggestive if all the people presented to the witness are in jail clothes. Defendants also point out that the situation in the courtroom that day was not a controlled one in which defendants could be compared with similar-looking people. Again, this by itself does not make the procedure impermissibly suggestive. "[T]here is no requirement that a defendant in a lineup, either in person or by photo, be surrounded by others nearly identical in appearance." (*People v. Brandon, supra,* 32 Cal.App.4th at p. 1052.) As the trial court pointed out, the situation was not intrinsically more suggestive than a typical in-court identification. (See *Baker v. Hocker* (9th Cir.1974) 496 F.2d 615, 617 [in-court identification at preliminary hearing not impermissibly suggestive].)

Defendants argue that "some" of the admonitions given to the witnesses "were defective in that they alerted the witnesses that police were focusing on a particular individual, such as the taller robber or the shorter robber." We do not see how an admonition would be "defective" because it stated the police were looking for someone who matched the description given by the witness.

Defendants point out that Carreno failed to identify Langston in a photo lineup, but then said Langston was the short robber when she saw him on the day of the preliminary hearing. But there is no rule that an identification procedure must have been impermissibly suggestive if the witness failed to identify the suspect via a prior procedure.

Finally, defendants say the fact that the witnesses were shown photo lineups and then also shown defendants through the courtroom door means the procedure as a whole was impermissibly suggestive because the live viewing reinforced the viewing of the photos. But again, the law does not deem impermissible suggestiveness to arise whenever police or prosecutors expose a witness to a defendant or his or her picture on multiple occasions. (*People v. Johnson* (2010) 183 Cal.App.4th 253, 273 [witness viewed surveillance video before photo lineup]; *People v. Wimberly* (1992) 5 Cal.App.4th 773, 788 [witness viewed photographs of suspect before live lineup].)

In his reply brief, Lawton contends that none of the witnesses pass the reliability test from *Manson v. Brathwaite, supra,* 432 U.S. 98, because they only saw the perpetrators briefly, changed their minds in some instances, and for similar reasons. As we have said, however, this test applies only if a defendant has shown that the identification procedure used was unduly suggestive. The photo lineup and courtroom-door procedures were not unduly suggestive for the reasons we have given.

For these reasons, we conclude defendants have not carried their burden of demonstrating a due process violation arising from these procedures. Because of this conclusion, we need not consider defendants' further argument that improper pretrial procedures tainted the trial identifications.

Langston, 2016 WL 2963353, at *27–31.

1. Right to Counsel

In United States v. Wade, 388 U.S. 218 (1967), an FBI agent arranged for two witnesses to observe a lineup, which consisted of the defendant and five or six other prisoners conducted in a courtroom of the local county courthouse, and of which defense counsel was not given notice. 388 U.S. at 220. In addressing whether the defendant had the right to counsel at the lineup, the Supreme Court examined the history of its Sixth Amendment jurisprudence, which "[i]n recognition of the[] realities of modern criminal prosecution, . . . ha[s] construed the Sixth Amendment guarantee to apply to 'critical' stages of the proceedings." Wade, 388 U.S. at 224.

The Supreme Court found that a defendant has the right to counsel at a post-indictment lineup or showup, reasoning:

> Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for Wade the postindictment lineup was a critical stage of the prosecution at which he was 'as much entitled to such aid (of counsel) * * * as at the trial itself.' Powell v. State of Alabama, 287 U.S. 45, at 57, 53 S.Ct. 55, at 60, 77 L.Ed. 158. Thus both Wade and his counsel should have been notified of the impending lineup, and counsel's presence should have been a requisite to conduct of the lineup, absent an 'intelligent waiver.' See Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70.

Wade, 388 U.S. at 236–37 (footnote omitted).

Six years later in United States v. Ash, 413 U.S. 300 (1973), the Supreme Court declined to extend Wade, finding that an accused does not have "the right to have counsel present whenever the Government conducts a post-indictment photographic display, containing a picture of the accused, for the purpose of allowing a witness to attempt an identification of the offender." 413 U.S. at 301–02. Ash clarified that the right to counsel did not extend to all post-indictment identification procedures, but rather was limited to "a trial-like confrontation, requiring the 'Assistance of Counsel' to preserve the adversary process by compensating for advantages of the prosecuting authorities," such as the lineup in Wade. Ash, 413 U.S. at 314.

Applying Wade and Ash, the Ninth Circuit has found that "the surreptitious observation of a defendant in the courtroom by an identification witness is "not an adversarial confrontation" requiring assistance of counsel. United States v. Montgomery, 150 F.3d 983, 993–95 (9th Cir.

1998). Although circuit caselaw is not governing law under AEDPA, Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents." Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005) (en banc).

In the instant case, the identification witnesses were led to the courtroom door to view Petitioner through the window without notice to defense counsel. The Ninth Circuit, applying Supreme Court precedent, found that a similar procedure did not deny the defendant of his right to counsel. Montgomery, 150 F.3d at 995. Therefore, the Court finds that the California Court of Appeal's denial of Petitioner's Sixth Amendment claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the ground that the identification procedure violated Petitioner's right to counsel.

## 2. Unduly Suggestive Identification Procedure

The Supreme Court has recognized that some identification procedures are "so unnecessarily suggestive and conducive to irreparable mistaken identification" that they deny due process of law. Stovall v. Denno, 388 U.S. 293, 302 (1967). "[D]ue process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." Perry v. New Hampshire, 565 U.S. 228, 238–39 (2012) (citing Manson v. Brathwaite, 432 U.S. 98, 112 (1977); Neil v. Biggers, 409 U.S. 188, 198 (1972)). Whether due process was violated by the identification procedure must be determined "on the totality of the circumstances," Stovall, 388 U.S. at 302, and "courts [must] assess, on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification,'" Perry, 565 U.S. at 239 (quoting Biggers, 409 U.S. at 201).

Multiple witnesses, including Michelle Castellanos, Barbara Martinez, Jackie Arnold, Jeff Revelle, Yvonne Carreno, and Maria Guillen,[11] made identifications at the courtroom door

---

[11] As noted by the California Court of Appeal, the defendants had moved to exclude the identification testimony of Michelle Castellanos, Barbara Martinez, Jeff Revelle, Yvonne Carreno, and Maria Guillen. Two other witnesses were included in the motion, but they did not testify for the prosecution and were not discussed on appeal. Langston,

on the day of the preliminary hearing and thereafter testified at Petitioner's trial. The witnesses were given admonitions prior to looking through the windows on the courtroom door and identifying Petitioner.[12] (7 RT 504–05, 508; 16 RT 2500–01; 17 RT 2703, 2707–08, 2716, 2719; 20 RT 3210; 24 RT 3808; 32 RT 5555–56). The admonitions essentially consisted of informing the witnesses that: there were people inside the courtroom that the detective wanted them to look at; the people inside may or may not be the ones responsible for the crime in which the witness was a victim; to keep in mind that hairstyles, mustaches, or beards could be changed; clothing, hairstyles, complexion, size, and build can all vary; to inform the detective if the witness recognized or did not recognize anybody; and the witness is under no obligation to select anyone if they did not believe those people were involved in the robbery. (6 RT 416–17; 7 RT 504–05; 17 RT 2703; 24 RT 3808; 36 RT 6135–36).

The witnesses were brought separately to look through the windows of a courtroom door. The witnesses observed one of the following configurations: (1) twelve in-custody defendants seated in the jury box, including Petitioner and former codefendant Antwyne Harper,[13] but not including Lawton; (2) four in-custody defendants seated in the jury box, including Petitioner and Harper, but not including Lawton; (3) Petitioner, Lawton, and Harper seated in the jury box with attorneys and other staff in the courtroom, but no judge present; or (4) Petitioner, Lawton, and Harper sitting at counsel table with attorneys and other staff in the courtroom. (17 RT 2701–02, 2717, 2719–20; 24 RT 3809–10, 3829; 32 RT 5555, 5613–15; 36 RT 6136, 6159, 6163).

In Baker v. Hocker, 496 F.2d 615 (9th Cir. 1974), the Ninth Circuit denied a due process claim challenging an identification made at a preliminary hearing when the petitioner was seated at counsel table beside two men who had already been identified in the crime. Applying Neil v. Biggers, 409 U.S. 188 (1972), and Stovall v. Denno, 388 U.S. 293 (1967), the Ninth Circuit

---

2016 WL 2963353, at *29. In the petition, Petitioner specifically names Barbara Martinez, Michelle Castellanos, and Jackie Arnold. (ECF No. 1 at 12).

[12] Jackie Arnold, Yvonne Carreno, Jeffrey Revelle, and Maria Guillen testified that they were unsure, could not recall, or did not receive admonitions prior to looking into the courtroom. (17 RT 2588; 22 RT 3497, 3525; 24 RT 3758). However, Sergeant Stratton and Detective Dossey testified that they gave these witnesses admonitions before the witnesses looked into the courtroom. (7 RT 504–05, 508; 17 RT 2707–08, 2719; 32 RT 5555–56).

[13] Antwyne Lamar Harper was charged in the information, but he was not tried with Petitioner and Lawton. Langston, 2016 WL 2963353, at *2.

concluded that the identification procedure used at the preliminary hearing was not unnecessarily suggestive, stating:

> Undoubtedly any in-court identification confrontation, whether at a preliminary hearing or at trial, whether the defendant is tried alone or with others, carries with it the stigma of the inevitable suggestion that the state thinks the defendant has committed the crime. Perhaps in appellant's case the suggestion was compounded by the presence of the two previously identified men. But more than suggestion is required for a due process violation—the procedure must create "unnecessary" or "impermissible" suggestion.

Baker, 496 F.2d at 617. Although circuit caselaw is not governing law under AEDPA, Ninth Circuit "precedents may be pertinent to the extent that they illuminate the meaning and application of Supreme Court precedents." Campbell, 408 F.3d at 1170.

Based on the foregoing, the Court finds that the California Court of Appeal's denial of Petitioner's identification procedures claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the ground that the identification procedure violated due process.

**D. Juror Bias**

In his fourth claim for relief, Petitioner asserts that he was denied his right to a fair trial and impartial jury when the trial court denied a mistrial and declined to replace Juror Number 4 after a spectator connected to Petitioner engaged in behavior that jurors found intimidating. (ECF No. 1 at 14–15). Respondent argues that the state court's denial of this claim was reasonable. (ECF No. 11 at 39).

Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's juror bias claim, the California Court of Appeal stated:

## VI. Spectator misconduct

During a break in the trial, several jurors overheard comments made in the hallway by a troublemaking spectator named Donna Paniagua. After a hearing on this topic, the court excused one juror and allowed others who had heard the comments to continue serving. Defendants now argue that the trial court erred when it refused to declare a mistrial or at least excuse one additional juror.

Paniagua first came to the court's attention on December 18, 2012, after a bailiff removed her from the courtroom for making eye contact in a communicative way with Lawton or Langston. The court called Paniagua before it, warned her not to continue behaving in that way, and allowed her to continue sitting in the audience. On January 2, 2013, Paniagua came to court with a pair of shoes for Langston, which she gave to Langston's counsel. Counsel gave the shoes to the bailiff, who searched them and found some tobacco or marijuana and matches concealed under the insole of each shoe. The jury was not aware of the contraband in the shoes. On the same day, however, a group of jurors informed the bailiff they had heard Paniagua speaking loudly on the phone about people in prison and a "green light on" someone, among other things.

The court questioned the jury. Five jurors (Nos. 4, 5, 6, 9, and 10) and three alternates (Nos. 1, 3, and 4) said they heard Paniagua talking in the hallway. The court questioned these eight separately. Their accounts of what happened generally coincided on the following points: Paniagua was seated in an area where jurors usually congregated, even though on previous occasions she had tended to go off by herself to talk on the phone; she was speaking in a loud voice. She said someone named Angel was getting out of prison and there was a green light or a hit on him. She said someone else—a cousin of the person she was speaking to—had gotten shot because he was a snitch. Paniagua seemed to have some connection to defendants as she had given shoes to one of the defense attorneys or had been making eye contact with one of the defendants.

After learning there had been some discussion of the matter among the jurors, the court also questioned the remaining jurors individually. Juror Nos. 1, 2, 3, and 12 heard nothing or heard Paniagua talking but made out none of the words. Juror No. 7 heard Paniagua refer to a snitch and a baby daddy. Juror No. 8 heard Paniagua use foul language and heard other jurors saying Paniagua had given signals to defendants and had referred to a green light and someone getting out of prison. Juror No. 11 heard fragments of Paniagua's comments and mainly remembered a reference to a baby daddy.

Only juror No. 4 and juror No. 10 said they thought Paniagua was trying to be intimidating. Only juror No. 10 could not be confident he would not hold what he heard against defendants when considering the gang issues in the case, since he understood Paniagua's terminology to be gang-related. Because juror No. 10 felt he was unable to continue without a bias based on Paniagua's statements, the court excused him over the People's objection.

Except for juror No. 10, the court admonished all jurors and alternates not to consider Paniagua's conduct when making their findings in the case. It obtained all jurors' and alternates' assurances that they would follow this instruction and remain impartial.

Defendants moved for a mistrial on the ground that many jurors heard Paniagua's comments and this "infected the entire process" because the jurors would be unable to set aside what they heard when considering the gang issues. Defendants also moved to excuse juror No. 4 because her testimony that she could be impartial was not credible. She thought Paniagua was trying to intimidate the jury, and other jurors testified that it was juror No. 4 who was most concerned about Paniagua's behavior. The trial court denied both motions.

In reviewing the court's rulings on both motions, we apply the abuse of discretion standard. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474; *People v. Silva* (2001) 25 Cal.4th 345, 372.)

### A. Mistrial motion

Defendants' challenge to the ruling on the mistrial motion is based on a claim that the trial court applied the wrong legal analysis. The court relied on *People v. Kross* (1952) 112 Cal.App.2d 602 (*Kross*), in which the defendant, who was accused of stealing fur coats by concealing them in his oversized pants, was confronted by news photographers in the courtroom while several jurors were present. As the defendant tried to conceal his face, the photographers said he would make a bad impression on the jury unless he showed himself and allowed them to take his picture with the baggy pants. (*Id.* at p. 611.) The trial court later admonished the jury not to consider the incident with the photographers and denied the defendant's motion for a mistrial. (*Ibid.*) The Court of Appeal affirmed the ruling, stating:

> "While the conduct of the photographers was an unfortunate occurrence there is no showing of prejudice which cannot be assumed where neither the trial court nor the prosecutor was involved, and where the court admonished the jury to disregard the occurrence, calling the jury's attention to their duty to consider only the evidence admitted in the case. The trial court had an opportunity to consider the likely effect of this occurrence upon the jury and the likelihood of prejudice resulting to the defendant. His rulings on both occasions are to the effect that no prejudice was shown. These determinations by the trial court are determinative on appeal in the absence of a clear abuse of discretion. We find no such abuse." (*Kross, supra,* 112 Cal.App.2d at pp. 611–612.)

In the present case, the trial court stated that the behavior and words of Paniagua to which jurors were exposed "involve[d] peripheral matters rather than issues to be resolved at trial" and were "not material because they have no bearing on the guilt of the defendants in this case." Then it quoted part of the above passage from *Kross* and said:

> "And just as in the case of Kross, I have had an opportunity to consider the likely effect of this occurrence upon the jury and the likelihood of prejudice resulting to the defendants. And it's my finding that this occurrence is not likely to affect the jury's ability to be fair and impartial, and it is not likely to create prejudice to either of the defendants."

Defendants argue that *Kross* is inapplicable. They say the analysis applicable to the facts in this case is found in *Remmer v. United States* (1954) 347 U.S. 227 (*Remmer*) and *People v. Danks* (2004) 32 Cal.4th 269 (*Danks*). In *Remmer,* the jury foreman was told by an unnamed person that he could profit by bringing in a not-guilty verdict. The foreman told the judge, who told the prosecutors, leading to an investigation by the FBI. The FBI issued a report, on the basis of which the

court decided to take no action. The defendant and defense counsel did not learn of the matter until after trial, at which time they filed a motion for a hearing on the effect of the occurrence on the jury and for a new trial. The motion was denied. (*Remmer, supra,* at pp. 228–229.) Holding that a hearing was required, the United States Supreme Court also stated a presumption favoring the defendant and imposed a burden of proof on the prosecution:

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." (*Remmer, supra,* 347 U.S. at p. 229.)

In *Danks,* the California Supreme Court stated a similar rule: " 'Misconduct by a juror, or a nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable "presumption" of prejudice.' " (*Danks, supra,* 32 Cal.4th at p. 302.)

Defendants' argument presupposes that Paniagua's actions amounted to "private communication, contact, or tampering ... with a juror ... about a matter pending before the jury" (*Remmer, supra,* 347 U.S. at p. 229) or " 'a nonjuror's tampering contact or communication with a sitting juror' " (*Danks, supra,* 32 Cal.4th at p. 302). The trial court, by contrast, believed Paniagua's actions were about peripheral, irrelevant matters. By implication, the court found the behavior did not amount to misconduct or tampering triggering a presumption of prejudice.

Rather than resolve this dispute about the nature of Paniagua's conduct, we will assume the standard of *Remmer* and *Danks* applies, that the incident should be presumed prejudicial, and that a mistrial should have been granted unless the record shows the presumption to be rebutted by evidence that defendants were not prejudiced. We will undertake the determination of whether the record shows this ourselves, rather than remanding to allow the trial court to exercise its discretion under the *Remmer–Danks* standard in the first instance.

It might be thought we must remand unless we conclude that no reasonable court applying *Remmer* and *Danks* could have found prejudice. This is incorrect, however. Although the decision on a mistrial motion is generally committed to the trial court's discretion, the specific question of whether prejudice arose from juror misconduct or jury tampering is a mixed question of law and fact subject to independent appellate review. (*Danks, supra,* 32 Cal.4th at p. 303.) The proper inquiry for us, therefore, is simply whether the record rebuts the prejudice presumed from the jurors' exposure to Paniagua.

Under the applicable standard of prejudice, "[t]he verdict will be set aside only if there appears a substantial likelihood of juror bias." (*Danks, supra,* 32 Cal.4th at p. 303.) Extraneous information received by a juror is deemed inherently prejudicial if "its erroneous introduction in the trial itself would have warranted reversal of the judgment." (*Ibid.*) If the matter is not inherently prejudicial, it is still grounds for reversal if an examination of the record as a whole shows " 'a substantial likelihood of actual bias.' " (*Ibid.*) These requirements are to be understood against the background of a presumption of prejudice, which must be overcome by evidence that there is no substantial likelihood of bias.

42

The jurors' exposure to Paniagua's conduct was not inherently prejudicial. Admission of evidence of that conduct at trial would not have been a sufficient ground on its own to reverse the judgment. Extensive gang evidence was properly admitted. The facts about Paniagua's behavior would not have made a very significant additional impact, even assuming the jurors would have inferred that she was associated with defendants and with the gang to which the other evidence connected them.

Paniagua's behavior also did not give rise to a substantial likelihood of actual bias in light of the record as a whole. The potential evidentiary impact (reinforcing the gang evidence) was minor, as we have said. The other potential impact would be that if the jurors believed Paniagua was trying to intimidate them and inferred that defendants put her up to it, they might have resented this and been influenced in their deliberations by this resentment. The record does not support a finding of a substantial likelihood that this happened, however. Only juror Nos. 4 and 10 thought Paniagua was trying to intimidate them. Juror No. 10 was excused and juror No. 4 pledged she would set the matter aside and not consider or be influenced by it. Defendants emphasize evidence that juror No. 4 was the juror most concerned about Paniagua's behavior, but under the totality of the circumstances, we think there is no substantial likelihood juror No. 4 was actually biased. The contact with Paniagua was "harmless to the defendant[s]." (*Remmer, supra,* 347 U.S. at p. 229.)

For these reasons, we conclude the mistrial motion was properly denied.

### B. Motion to excuse juror No. 4

Defendants maintain juror No. 4 should have been excused and replaced by an alternate on grounds she was "unable to perform ... her duty...." (§ 1089.) They say the trial court's refusal to excuse the juror denied them a fair trial.

" 'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality." The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 807.)

About Paniagua's remarks while talking on her phone, juror No. 4 testified, "I felt it was a form of intimidation, because she was talking so loudly on her cell phone." The juror continued, "And she drew everyone's attention. Everyone turned and looked at her." She repeated that she felt it was a form of intimidation, "But I'm not easily intimidated so." When asked if Paniagua's actions had any effect on her, juror No. 4 said no. When asked if the experience would affect her ability to be impartial, the juror testified, "No, it won't have any influence. I will be fair." She further affirmed that she would move on and decide the case based on the evidence presented in court. In denying the motion to excuse her, the court said it was satisfied with her responses.

As defendants point out, the trial court was not compelled to accept the juror's assurances. A juror might falsely say he or she is not influenced by an impropriety because he or she is embarrassed or wants to please the judge. There is nothing in the record to suggest, however, that the court doubted the juror's credibility but denied the motion anyway because it thought it was bound by her testimony. We conclude that it weighed all the evidence and found her credible. Substantial

evidence supported its finding. Thus, the court could, within the bounds of reason, find that bias on the part of juror No. 4 was not a demonstrable reality. It did not abuse its discretion.

Langston, 2016 WL 2963353, at *33–37.

In Smith v. Phillips, 455 U.S. 209 (1982), the Supreme Court declared:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in Remmer[14] and held in this case.

455 U.S. at 217. Smith involved a juror in a state criminal trial who, during the trial, applied for an investigator position in the state prosecutor's office. Id. at 212. Although the prosecuting attorneys knew of the juror's application, they chose not to inform the court or the defense until after the jury returned the verdict. Id. at 212–13. After holding a hearing in which the juror and prosecutors testified, the state trial court denied the defendant's motion to vacate his conviction, finding that the juror was not biased and that the evidence did not suggest a "sinister or dishonest motive" on the part of the prosecutors. Id. at 213–14. The Supreme Court held that the post-trial hearing satisfied due process and that "[o]f equal importance, this case is a federal habeas action in which Justice Birns' findings are presumptively correct under 28 U.S.C. § 2254(d)." Id. at 218.

Here, the trial court promptly held a hearing after a group of jurors informed the bailiff they heard Paniagua speaking loudly on the phone. The trial court took nearly an entire day to question all the jurors and alternate jurors individually. (29 RT 4871). The trial court engaged in the following pertinent exchange with Juror Number 4 during its inquiry:

---

[14] Remmer v. United States, 347 U.S. 227 (1954) (finding reversible error where the district court did not conduct a hearing on a motion for new trial based on a third-party communication to a juror that he could profit by bringing in a verdict favorable to the defendant that was followed by a mid-trial investigation of the incident by the Federal Bureau of Investigation).

Q. Ma'am, did you have any feeling that the woman was trying to somehow influence you or communicate with you?

A. I felt it was a form of intimidation, because she was talking so loudly on her cell phone.

Q. So do you think that she—

A. And she drew everyone's attention. Everyone turned and looked at her.

Q. Did you form the opinion that she was talking in such a way that she knew jurors were listening to her?

A. Yes, sir.

Q. Okay. I just want to know what your opinion was.

A. Yes.

Q. And how did you feel about that?

A. Well, I felt it was a form of intimidation. But I'm not easily intimidated so.

Q. So did it have any effect on you?

A. No. But I just felt that it was inappropriate and I needed to tell the bailiff.

. . .

Q. Is there anything about her conduct that you think is important to tell me?

A. No.

Q. Now, do you have any—is this going to have any influence on your ability to be completely fair and impartial to all the parties involved, including the defendants and the prosecution?

A. No, it won't have any influence. I will be fair.

Q. You understand that what you might have seen or heard is not evidence in this case?

A. I understand that.

Q. It's nothing you can discuss or consider, discuss with your fellow jurors or consider in any way.

A. I understand that also.

Q. So is there any reason why this is going to be an issue, or are you ready to move one and—

A. It will not be an issue as far as I'm concerned.

Q. You are ready to move on?

1    A. I am.

2    Q. And decide the case based upon the evidence presented here in the courtroom?

3    A. I am.

4    Q. In a fair and impartial way?

5    A. Of course.

6  (28 RT 4724–25).

7        Because Juror Number 10 testified that he felt unable to continue without bias based on

8  Paniagua's statements, the court excused him. (28 RT 4763–64, 4768, 4774). Subsequently, the

9  court gave the following admonishment to the remaining jurors and alternates:

10           I want to take this time to remind all of you of some important rules. And these
             are things we discussed before. And I have emphasized, in talking to each of you
11           today, how important it is that you remember it's your duty to decide this case
             based solely upon the evidence properly admitted here in the courtroom. And that
12           includes things like sworn testimony of witnesses, evidence that's properly
             admitted. It does not include things that happen out on the street, in the hallway of
13           the courthouse, even in the audience section of our courtroom. So I have tried to
             make that clear.
14
   (29 RT 4853–54). The court also received assurances from the remaining jurors and alternates
15
   that: (1) they understood whatever occurred with respect to Ms. Paniagua was not evidence in the
16
   trial and could not be considered; and (2) it would not affect their ability to be fair and impartial.
17
   (28 RT 4783, 4789–90, 4795–96, 4798, 4803, 4806, 4812–13, 4818–19, 4822. 4828, 4832–33,
18
   4835–36, 4841–42, 4844–45, 4846–47, 4851–52).
19
         After questioning each juror and hearing arguments from counsel, the trial court
20
   concluded:
21
             Based on a review of all the circumstances and the input from all the various
22           jurors, I find that the conversations the jurors were having outside the courtroom
             with regard to Ms. Paniagua and her conduct either when she was talking loudly
23           on the cell phone or her conduct while she was seated in the audience section of
             the courtroom, those do involve peripheral matters rather than issues to be
24           resolved at trial. And I do find them to be nonprejudicial.

25           I find that the juror statements with regard to Ms. Paniagua and any feelings that
             jurors had about her because of her behavior are not material because they have
26           no bearing on the guilt of the defendants in this case. The Court is satisfied that
             the jurors were being honest and forthright in answering the Court's questions.
27           We excused Juror No. 10 because of his honest and forthright responses that
             indicated to the Court that he could no longer be completely fair and impartial.
28           And he was excused for good cause.

                                         46

With regard to the—I am looking at the Kross case, K-r-o-s-s, at Page 611, 612. And it was significant in that case that there was no showing of prejudice which cannot be assumed where neither the Trial Court nor the prosecutor was involved and where the Court admonished the jury to disregard the occurrence, calling the jury's attention to their duty to consider only the evidence admitted in the case.

And just as in the case of Kross, I have had an opportunity to consider the likely effect of this occurrence upon the jury and the likelihood of prejudice resulting to the defendants. And it's my finding that this occurrence is not likely to affect the jury's ability to be fair and impartial, and it is not likely to create prejudice to either of the defendants.

So I do not find there has been a miscarriage of justice. I do not find that either of the defendants have been denied a fair trial. I am certainly prepared to give further admonitions. And one admonition—so the motions for mistrial are denied.

. . .

I am also denying the motion to excuse Juror No. 4 for good cause. I am satisfied that she was truthful and forthright in her responses to the Court. I am satisfied she can be completely fair and impartial.

(29 RT 4878–80).

The Court finds that the California Court of Appeal's decision was not contrary to, or an unreasonable application of, clearly established federal law. After learning of the juror misconduct, the trial court conducted a hearing in compliance with <u>Remmer</u> and <u>Smith</u>. The state court's conclusion that the jurors, including Juror Number 4, remained fair and impartial was not an unreasonable determination of fact in light of the record. The California Court of Appeal's denial of the juror bias claim was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his fourth claim, and it should be denied.

**V.**

**RECOMMENDATION**

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within

**THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 13, 2018**

UNITED STATES MAGISTRATE JUDGE

48